In the Matter of the ESTATE OF Maggie CARANO, Deceased.

SACRED HEART PARISH, and the Roman Catholic Diocese of Tulsa, Appellants,

v.

Bill GIACOMO, Conservator of Carrie E. Dominic, Appellee.

No. 74278.

Supreme Court of Oklahoma.

Feb. 1, 1994.

John B. Jarboe, M. Shawn Lawhorn, Paul R. Thomas, Jarboe & Stoermer, Tulsa, for appellant.

Richard A. Woolery, Sapulpa, for appellee.

John Mark Young, Sapulpa, Personal Representative for the Estate.

LAVENDER, Vice Chief Justice.

The issue in this case is whether the trial court's findings of lack of mental capacity to make an assignment and the existence of undue influence are clearly against the weight of the evidence. We hold that the trial court's findings are not clearly against the weight of the evidence and therefore its judgment will not be disturbed on appeal.

## FACTS AND PROCEDURE

Carrie E. Dominic (Dominic) was named principal beneficiary and co-executrix in a 1977 will by her sister Maggie Carano (Carano), now deceased. Dominic had lived with Carano for several years in the latter's home in Sapulpa and had been involved with and contributed to Appellant Sacred Heart Catholic Church (Church) of Sapulpa. Carano's estate on her death in 1977, included stock, bank accounts, family inheritance, a house and its contents, insurance, a bank loan, and various expenses and liabilities. The Will had been the subject of a probate proceeding pending since 1977 in Creek County District Court.

Following Carano's death, Dominic remained in the house, her only home, where she was joined by George Barzellone (Barzellone), nephew of Dominic and Carano, in 1985 at Dominic's invitation. At Dominic's request, Barzellone assisted her attorneys in gathering and analyzing records in the preparation of an accounting of Carano's estate and Dominic's expenses in managing it. Barzellone also assisted Dominic with her own financial interests.

In May 1988, at the age of 81, Dominic executed an assignment giving the entirety of the Carano estate to Appellant Roman Catholic Diocese of Tulsa for the use and benefit of Sacred Heart Church. The same day Dominic also executed her Will naming the

Church as chief beneficiary and thus revoking her previous Will which had named relatives and the Church as chief beneficiaries. The assignment was witnessed by Barzellone and his son's sister-in-law, who also notarized it. Dominic signed the assignment and Will in the Carano home. Barzellone took the Will to the Church to be witnessed by the priest of the donee Church and his secretary. Dominic was not present when the Will was witnessed. The Will and the incidents surrounding it, although not at issue in this action, are part of the total circumstances involving the assignment and therefore were included in the evidence presented to the trial court.

Both the assignment and the Will were prepared by the Church's attorney (Attorney) allegedly at Dominic's request, through Barzellone and two letters from Dominic. Barzellone testified that Dominic hand wrote the letters that instructed the Attorney regarding the assignment and Will. Barzellone then took the letters to be typed by his son's sister-in-law, a former employee of Barzellone and sons. The typed letters were then returned to Barzellone to be signed by Dominic and mailed to the Attorney. The Attorney never met with Dominic and did not recall, during his testimony before the trial court, whether he ever talked with her by phone. All dealings on this matter were conducted through Barzellone. Dominic received no independent legal advice concerning the assignment or Will, although she had an attorney. Her attorney was not informed of the assignment until sometime after its execution.

One of Barzellone's sons testified at trial that Dominic had discussed with him the possibility of making a gift of the Carano estate to the Church in order to assist the priest and building project. The son also testified that Dominic acknowledged there was some family opposition to the donation. The son further testified that he was familiar with Dominic's financial affairs and that he thought she had adequate support of her own to sustain her after making the assignment. He also stated they had discussed the family taking care of her when and if she required it.

The Attorney did not file the assignment until June 1989. In the meantime, Dominic was relocated to a retirement center in Pauls Valley by Barzellone and son, owned and operated by Barzellone's sons, to be near Dominic's sister, Barzellone's mother, and because Dominic's health was deteriorating. Dominic was moved without the rest of her family being informed. The District Court in handling the probate of Carano's Will named Dominic's attorney as personal representative of the Carano estate shortly after Dominic's relocation to the retirement center, thereby replacing Dominic.

Appellee Bill Giacomo (Giacomo), another nephew and son of Pete Giacomo, deceased, upon learning of Dominic's move to Pauls Valley, had himself appointed Dominic's conservator, and moved Dominic from the retirement center to his home in Sapulpa. When Giacomo learned of the assignment, following its filing, he brought this action to have it set aside.

Giacomo alleged lack of mental capacity of Dominic and the undue influence as grounds to set aside the assignment. At the trial Dominic testified she had not read the assignment prior to the trial date and was not aware of what it accomplished. Dominic testified she believed she was to inherit property from Carano, was not aware of making a gift of the property to anyone, was not acquainted with the Attorney, and did not ask him to prepare the assignment. However, Dominic also testified she was still living in Carano's house with Barzellone when at the time she was residing with Giacomo in his home.

On the issue of capacity, the court admitted a deposition by Dominic's physician testifying that Dominic appeared to be in good health and in good mental condition when he examined her four days following the execution of the assignment. The deposition also includes testimony that the physician had prescribed a vasodilator for Dominic in the mid–1980's for memory problems, but the medication was discontinued in 1987 and the physician testified Dominic had no memory problems in 1988.

Further testimony from Barzellone and Giacomo stated that Dominic was forgetful. and had deteriorated considerably from around the time of the assignment, however Giacomo testified Dominic had improved in recent months. Finally, the judge, who had heard many of the actions regarding the Carano estate, took into consideration her personal observation of Dominic as a witness at a probate hearing three days before the assignment was executed.[1]

The trial court found undue influence on the part of Barzellone, but none on the part of the Church. The Court of Appeals reversed the trial court on both claims and held that the trial court's findings were clearly against the weight of the evidence.

## STANDARD OF REVIEW
## MENTAL CAPACITY

The standard of review when looking at questions of competency or capacity to donate or devise is for the court to review and weigh the evidence, the entire record. The issue of testamentary capacity however, is a question of fact and the trial court's judgment will not be disturbed unless it is clearly against the weight of the evidence.[2]

Without question, the rule for testamentary capacity is well established and defined. The problem arises in implementing the rule to the facts of each case because there is no way to precisely determine where capacity ends and incapacity begins.[3]

The rule holds that to have testamentary capacity [4] a person must know in a general way the character and extent of his property and understand his relationship to the beneficiary of his gift as well as his relationship to those who "ought to be in his mind," and he must understand the nature and effect of his act.[5] Where the evidence fairly and reasonably supports the findings of testamentary incapacity based on all the facts and circumstances of each particular case, the same will not be disturbed on appeal.[6]

There was testimony at the trial that Dominic understood what she was doing in assigning the Carano estate to the Church and that she had on one occasion discussed this possibility with Barzellone's son and that she had named the Church as a beneficiary of her own estate in an earlier Will and had

1. Although the Church objected to this evidence at trial and again in its petition for certiorari we need not decide whether this was error on the part of the judge in that there was sufficient evidence to substantiate the decision without such evidence.

2. *Matter of Estate of Beal*, 769 P.2d 150 (Okl. 1989); *White v. Palmer*, 498 P.2d 1401 (Okl. 1971); *McSpadden v. Mahoney*, 431 P.2d 432 (Okl.1967); *In re Estate of Lacy*, 431 P.2d 366 (Okl.1967); *Hubbell v. Houston*, 441 P.2d 1010 (Okl.1967).

3. *In re Estate of Lacy*, 431 P.2d 366.

4. Although Dominic's will is not challenged in this action, since it bears the same date of execution as the assignment, the finding of mental capacity or lack of to execute one certainly bears on the capacity to execute the other. Therefore, we will view the Will as part of the entire record and the circumstances surrounding the execution and validity of the assignment. In other words, Dominic cannot be found to have had mental capacity to execute one and found to have lacked capacity to execute the other. The donor must possess sufficient mental capacity to make a gift. Where "capacity" is discussed in this opinion, whether termed "testamentary capacity," "men-

tal capacity," or "capacity" its meaning will be the same.

5. *In re Estate of Lacy*, 431 P.2d at 368. We note that to make a gift inter vivos, three elements are required: intention to give; complete delivery of the thing given; and acceptance by the donee. *McSpadden*, 431 P.2d at 439. Intention to give per se is not at issue before us and it goes without saying that mental capacity must precede intent. Therefore we are confining our review to mental capacity.

We also note that although delivery of the assignment document was made to the Church, the actual gift, the estate including the Carano home, was not delivered as of one year following the delivery of the document. In fact Dominic was still living in the home months after the assignment was made and still making fixture purchases for the house, even though she did not reserve a life estate in the house. Delivery of the thing· given is not at issue before us, but it reflects on Dominic's mental capacity and understanding as to what she was giving at the time of the execution.

6. *Hunter v. Battiest*, 79 Okl. 248, 192 P. 575 (1920) (*explained Re Harjoche's Estate*, 193 Okl. 631, 146 P.2d 130 (1944)) (*followed Re Estate of Beal*, 769 P.2d 150 (Okl.1989)).

revised her Will to name the Church as the principal beneficiary. In other words, there was evidence that her actions in making the gift to the Church were planned and not the result of impulse. Testimony also notes that Dominic had an undisclosed independent means of support and that discussion was held regarding her care by the family when she reached that point of such physical need. Her physician stated Dominic's physical and mental health were good four days following the execution of the assignment. All of this evidence tends to support the claim Dominic was mentally capable when she executed the assignment. The Church contends that we must look to mental capacity only at the time of the execution which was May 1988. However, proof of testamentary capacity is not necessarily confined to the exact time of the execution.[7]

Equally impressive is the evidence indicating lack of capacity. Both Barzellone and Giacomo testified that Dominic was becoming forgetful around the time the assignment and Will were prepared and executed. Dominic's physician testified she had been on medication for memory problems as recent as the year before the execution, although Dominic had not complained of loss of memory in 1988 and was no longer taking the medication. Barzellone testified that Dominic deteriorated so much so from after the time of the execution that she required someone to care for her during the day while he was away at work. Barzellone hired his daughter to care for Dominic during the daytime. Barzellone also testified Dominic exhibited behavior abnormal for her at this same time, for example, "not making her bed or dressing when she arose and appearing in the den in her undergarments and to which her granddaughter would have to dress her". Dominic's deterioration eventually led Barzellone to arrange for her to move to the nursing home owned by his sons. He testified the move was at Dominic's request so she could be with her comatose sister, Barzellone's mother. Barzellone further testified the move was temporary.

Dominic was eighty-one at the time of the execution. Advanced age and reduced mental processes will not invalidate a gift where the donor is competent to understand the nature and effect of the transaction.[8] Dominic's age therefore is not necessarily significant, but her actions and behavior accompanying her age are factors that must be considered in determining her capacity to donate.

Dominic testified that she had no knowledge of having made the assignment of the Carano estate and believed she was still set to inherit it. However, it is unclear how much credence her testimony merits since Dominic also appeared to be confused during her testimony when answering questions concerning her current residence.

Giacomo contends that in determining mental capacity the total circumstances should be considered. And in looking at the entire record, we find testimony by Barzellone that Dominic purchased a dishwasher and had it installed in the Carano home three or four months after she had assigned the home to the Church. There was evidence that a week before Dominic moved to the nursing home she had her telephone number unlisted. Yet, no evidence was presented at trial that Dominic reserved a life estate in the home when she made the assignment or that there was any arrangement between the Church and Dominic to allow her to remain in her home.

Even though her actions in and of themselves months after the assignment was made may have no bearing on her capacity at the time of the execution, these actions raise the question whether Dominic understood what she was doing at the time of the execution. If Dominic assigned the property to the Church and understood what she was doing, there is no explanation as to why she was still making purchases for and changes on the home months later and why Barzellone allowed her to do so. It could be attributed to bad memory or it could be that Dominic lacked the capacity when executing the assignment to understand she was giving away the home in which she lived. Also, by

**7.** *In re Estate of Lacy,* 431 P.2d at 368.

**8.** *McSpadden,* 431 P.2d 432.

executing the assignment and the Will Dominic was vastly diminishing the inheritance of her family of which some had been principal beneficiaries in her previous Will.

The fact that the Will is unjust or unnatural does not of itself establish testamentary incapacity, but it is a circumstance which may be considered in connection with other evidence, and which may have weight in determining the capacity of the testator; and an unnatural or unjust disposition coupled with other evidence indicating incapacity may justify a verdict against the will.[9]

In weighing the evidence before the trial court we cannot say that the judgment of the trial court is against the clear weight of the evidence. Therefore, the trial court's finding of lack of mental capacity of Dominic at the time the assignment was executed will not be disturbed. We conclude that the trial court's invalidation of the assignment on the ground of lack of mental capacity was proper.

## STANDARD OF REVIEW
## UNDUE INFLUENCE

### I.

■ The trial court found undue influence exerted by Barzellone on Dominic and set aside the assignment on that ground as well. The standard of review is the same for undue influence. The reviewing court's duty is to examine the entire record and weigh the evidence. The trial court's finding will not be disturbed unless clearly against the weight of the evidence.[10]

■ Barzellone testified that everything he did concerning the Carano estate and the assignment he did at Dominic's request. There is no doubt that Barzellone

and Dominic held a confidential relationship. However, influence arising from affection and kindness is natural and lawful and does not make a gift voidable.[11] In reviewing the evidence, we must weigh the entire record. Testimony at trial established that Barzellone had lived with Dominic and assisted her with her personal affairs and those of the Carano estate. Barzellone had served as intermediary between Dominic and the Church and its agent Attorney in the initiation, execution, and delivery of the assignment and Will. Barzellone provided secretarial service to Dominic via his son's sister-in-law who provided notary service to Dominic. He met with the Attorney to initiate the assignment and Will in favor of the Church allegedly at Dominic's request. And finally, he served as witness to the assignment, and took the Will to the Church to be witnessed.[12]

■ Barzellone consulted with the Church, sole donee of the assignment, and its agent Attorney who prepared the assignment and Will instead of contacting and consulting with Dominic's attorney, who was not even made aware of the assignment until sometime after its execution. In *Anderson v. Davis*[13] we discussed factors to be considered in determining undue influence sufficient to sustain the contest of a will. Among the factors was the use of an attorney who the testator was not previously acquainted with, had never employed, and who was hired by the beneficiary of her will to draw up the instrument. In the case at hand both the Attorney and Dominic testified they had never met the other, were not acquainted, and the Attorney could not recall if he had even ever talked with Dominic by phone.

Dominic's niece, Giacomo's sister, testified at trial that on one of her visits to Dominic's

9. *In re Estate of Lacy,* 431 P.2d at 371–72.

10. *Hubbell v. Houston,* 441 P.2d 1010 (Okl.1967).

11. *McSpadden,* 431 P.2d at 438.

12. Although Dominic's will is not challenged in this action, we note the witnesses signed the document out of the presence of Dominic which is contrary to the requirement of 84 O.S.1991 § 54(4) (This section remains the same as the 1981 version in effect at the time the Will was executed). While we are not ruling on the validi-

ty of the Will, the fact that it bears the same date as the assignment and is presumed to have been executed on the same day, it is a circumstance surrounding the execution of the assignment and has a bearing on undue influence. In contesting a gift or will, one is not confined to just the facts he presents, but is entitled to the normal inferences derived from the evidence and circumstantial proof. *Re Estate of Beal,* 769 P.2d at 154.

13. 208 Okla. 477, 256 P.2d 1099 (1952).

home a few months prior to the assignment Barzellone entered the room demanding Dominic to sign a handwritten letter concerning· the disengagement of Dominic's former attorney. The niece advised Dominic to not sign the letter until she read it. Barzellone persisted until Dominic signed it. The niece testified she advised both Barzellone and Dominic that Dominic did not know what she was signing and she should not sign it until she did. When Barzellone saw that Dominic had signed the letter using her deceased husband's name rather than using her name, he tore up the letter. The niece retrieved the letter and the court accepted it as evidence at trial.

> Mere suspicion, conjecture, possibility or guess that undue influence has been exercised is not sufficient to defeat a grant of conveyance otherwise valid.... It is only when influences have been such as to confuse the judgment and control the will of the grantor that they become undue influences.[14]

Barzellone did not rebut this testimony.

There was conflicting testimony at trial regarding whether anyone had read the assignment to Dominic. Barzellone said he read the assignment to her prior to her signing. The notary who was Barzellone's son's sister-in-law, testified that the assignment was not read to Dominic prior to her signing.

Barzellone later made arrangements for Dominic to be placed in a nursing home and did not inform her other relatives of the move. The relatives only learned of the move by their own devices. Dominic's attorney testified that most of his dealings concerning the Carano estate were done through Barzellone and that he was very helpful. Indeed, the attorney characterized Barzellone as a liaison. Further testimony showed that Barzellone was joint tenant of Dominic's personal bank accounts.

We cannot say from this review of the record that the trial court's finding of undue influence was clearly against the weight of the evidence. Therefore, the court's judgment will not be disturbed.

## II.

In weighing the evidence concerning undue influence, we also consider the trial court's finding that there was no undue influence on the part of the Church in that it is the duty of this Court in examining the whole record and in weighing the evidence to render such judgment as should have been rendered by the district court.[15] Although a *close* confidential relationship was not established between the Church and Dominic, there did exist a type of confidential relationship between Dominic as a parishioner and her church. Further, the Attorney as agent of the Church prepared the assignment and Will for donor Dominic which named the Church as donee and chief beneficiary. We find these actions created a fiduciary relationship.

In *Anderson v. Davis*, we stated, that when a confidential relationship exists between a testator and beneficiary, slight evidence is sufficient to set aside a will on undue influence grounds.[16] "[A] presumption of invalidity on such ground arises in a case of a gift to one in a dominant position, such as a fiduciary or one in a relation of trust and confidence."[17] Further, in *Hunter*

---

14. *Antle v. Hartman,* 193 Okl. 524, 145 P.2d 756 (1944).

> To establish undue influence it is not necessary that there be direct testimony that threats were made or even persistent entreaty or persuasion was brought to bear upon the mind of the testatrix. It is sufficient that if, from all the surrounding circumstances connected with the making of the will, it appears that any undue influence has been exercised, the court should not admit the will to probate. *McCarty v. Weatherly,* 85 Okl. 123, 204 P. 632 (1922).

15. *Anderson v. Davis,* 208 Okl. 477, 256 P.2d 1099, 1100 (1952).

16. *Id.* at 1099.

17. *Cummings v. Garris,* 362 P.2d 1106, 1108 (Okl.1961). We said in *Hubbell,* 441 P.2d 1010, that the burden of proof to show undue influence is on the contestant and that there is an unbroken line of authority that states that the contestant meets his burden and a presumption attaches when he shows a confidential relationship between testator and beneficiary and where the beneficiary has assisted in the preparation of the instrument. In the instant case the Attorney as agent of the beneficiary Church drafted the assignment and Will naming the Church as sole donee and principal beneficiary.

we determined that when one stands in the relationship of attorney to a testator, a fiduciary position of highest trust, and is the principal beneficiary, *there is a presumption that undue influence existed and the beneficiary bears the burden of showing the contrary.*[18]

■ The Attorney in the case at hand however, argues that he considered *the Church* his client and that *the Church* was the principal beneficiary. However, inasmuch as he remained the only legal counsel for the donor, the trust extended to Dominic as well. The attorney was the agent of the Church and was acting in its interest yet, he was the one that drew up the Will for Dominic. We find that in drafting the assignment and Will, the attorney's actions established a fiduciary relationship between himself and Dominic.

■ A primary consideration on the validity of a gift made under a confidential relationship is whether the donor had the benefit of independent advice before making the gift.[19] "The burden of overcoming the presumption of . . . undue influence is usually met by showing that the grantor had the benefit of competent and independent advice of some disinterested third person."[20] In reviewing the evidence presented, we do not find that Dominic had such advice.

The Church's Attorney testified that it was not unusual for him to be asked to prepare documents that contain gifts to the Church. He further testified that it was generally his practice to advise the person for whom he drafts the instrument to seek independent counsel or he makes his own determination as to whether that person had outside advice. Dominic had no such advice.

The Attorney testified he had no idea if there was intervening, independent legal advice. Furthermore, the Attorney never met personally with Dominic to discuss the gift and Will and could not recall if he had even spoken with her by phone. Yet, the Church's Attorney was the agent for the sole benefactor of the assignment and by drafting the assignment and Will placed himself in a fiduciary position with Dominic. It is clear Dominic did not receive the quality of independent advice called for by our case law.

When a will is prepared by the sole or principal beneficiary, who was the confidential agent or who occupied a position of confidence or trust, to the testator, the instrument will not be held valid . . . unless it be affirmatively shown (a) that the testator read or knew its contents, and (b) had independent advice with reference thereto. . . . [T]he term "independent advice" . . . mean[s] that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its effect, but who was, furthermore, so disassociated from the interest of the donee as to be in a position to advise with the donor impartially and confidentially as to the consequences to himself of proposed benefaction. (Emphasis added).[21]

Although Dominic had an attorney who was familiar with the subject of the assignment, this attorney was not consulted or informed of the assignment by Barzellone or the Church's Attorney prior to its execution and only became aware of it later on. If, as the Attorney testified, it is not unusual for him as agent of the Church to be asked to draw up instruments donating or leaving gifts to the Church, he should have advised the donor to seek independent advice in order to avoid conflict of interest, undue influence, and the appearance of impropriety. In fact, as the Attorney testified, it *generally*

---

**18.** 79 Okl. at 251, 192 P. at 578.

**19.** *McSpadden,* 431 P.2d at 437.

**20.** *Id.; White v. Palmer,* 498 P.2d 1401 (Okl. 1971). We said in *Hunter,* 79 Okl. at 252, 192 P. at 579:

When the legal presumption of undue influence has arisen by showing confidential relations, whether in dispositions of property inter vivos or by will, the burden of proof is upon the party seeking to take the benefit of such disposition to rebut the presumption attaching hereto by showing either a severance of the confidential relations, or that the party making the disposition had competent and independent advice in regard thereto.

**21.** *Anderson,* 208 Okl. at 481, 256 P.2d at 1103.

was his practice to suggest independent advice or to determine if such advice had been given. Indeed, we note that under case law, it was incumbent on the Attorney to show Dominic had independent advice and that she had a full understanding of the documents.[22]

The Church relies on *Lindley v. Lindley*[23] where the New Mexico Supreme Court upheld gifts of cash and realty to a church, its minister, and others, even though the donor did not receive independent or disinterested advice. The gifts did not impoverish the donor, but left the donor with ample income for her lifetime. However, in distinguishing *Lindley* from the instant case, we note that the donor in *Lindley* retained a life estate in her gift in addition to having ample income for her lifetime, some of which was derived from the life estate.

Although testimony was given at trial that Dominic had her own means of financial support, the trial court was not presented with proof and figures of what comprised that support. The New Mexico Supreme Court in *Lindley* found that a failure to show independent advice weighs heavily toward presumption, but that this presumption may be rebutted with clear and satisfactory evidence to the contrary. Among those factors were ample support of the donor, the fact that the trial court found the donor to have the mental capacity to donate, and the fact that the *Lindley* donor confirmed the gifts and expressed her satisfaction on several occasions for what she had done.[24] There was no similar evidence in the case at hand. Dominic did not retain a life estate in her home. In fact, Dominic testified at trial that she had no knowledge or understanding of the assignment.

## CONCLUSION

For the reasons stated herein, we **VACATE** the court of appeals' opinion. We **AFFIRM** the trial court in its judgment to set aside the assignment as null and void due to its finding of lack of mental capacity and undue influence.

22. *See Hunter,* 79 Okl. at 252, 192 P. at 579.

23. 67 N.M. 439, 356 P.2d 455 (1960).

HODGES, C.J., and SIMMS, HARGRAVE, OPALA, ALMA WILSON and KAUGER, JJ., concur.

SUMMERS and WATT, JJ., concur in result.