In The Matter of the ESTATE OF John G. GERARD, Deceased; Gene Crabtree, Executor, Appellant,

v.

Violet T. GERARD, widow and other heirs at law of John G. Gerard, Appellee.

No. 83503.

Supreme Court of Oklahoma.

Dec. 19, 1995.

As Corrected Dec. 27, 1995.

Rehearing Denied Feb. 22, 1996.

Ollie Gresham, Tulsa, Birmingham, Morley, Weatherford and Priore by David L. Weatherford, Tulsa, for Appellant Gene Crabtree.

Wilson & Payne by W. Robert Wilson, Pawhuska, for Appellee Violet T. Gerard.

Garrison, Brown, Carlson, Buchanan & Busby by Denzil D. Garrison, William W. Busby, Bartlesville, for Appellees Heirs of John G. Gerard other than Violet T. Gerard.

HODGES, Justice.

The issues presented in this case are: (1) whether the finding of the trial court that Decedent lacked testamentary capacity to execute his Last Will and Testament dated June 29, 1991, (the Will) was clearly contrary to the weight of the evidence, and (2) whether the finding of the trial court that Decedent was subjected to undue influence in regard to the Will was clearly contrary to the weight of the evidence. We answer both issues in the negative.

## I. FACTS

Dr. John G. Gerard and Violet T. Gerard, both in their seventies, had been married approximately two years at his death on October 19, 1991. Dr. Gerard had been battling prostate cancer for some time prior to his death. In addition to Violet, John was survived by his sister-in-law Eva and other heirs. During the months preceding his death, Dr. Gerard grew increasingly dependent on his acquaintances Gene Crabtree (Crabtree or Executor) and Joyce Crabtree.

On June 6, 1991, John Gerard executed a will naming Eva Gerard as executrix and allegedly making favorable provisions for his wife Violet Gerard. On June 20, 1991, a new will was executed, through a different lawyer, removing all mention of Violet. The new will funded a living trust and Eva Gerard was named trustee. Dr. Gerard originally included several favorable dispositions for Violet Gerard. Dr. Gerard expressed his concern for the welfare of his wife to numerous people. He wanted to make certain he provided for her, and there is evidence he wanted her to have the house they shared.

The trust instrument was amended several times, the last being two days before the death of Dr. Gerard. On the day of the final amendment, Violet Gerard was sent on an errand by Joyce Crabtree. Violet was not present when the final changes were made. The various amendments had the cumulative effect of eliminating Eva Gerard, Violet Gerard and all other heirs. The Crabtrees were put in complete control of the trust.

During the time period in which these amendments were made, Dr. Gerard was a frequent visitor to the Crabtree home. Dr. Gerard was viewed as a frugal man by all who knew him. Even though he watched his money very closely, he gave the Crabtrees $5,000 to use to buy Bibles for the poor. Instead, the Crabtrees used the money to buy Bibles to sell at their store.

Joyce Crabtree began taking Dr. Gerard to his visits with various doctors. However, Violet was always left in the waiting room while Mrs. Crabtree accompanied Dr. Gerard back to see the doctor.

Joyce Crabtree became progressively more involved in Dr. Gerard's affairs. She led others to believe that she was a nurse and assumed responsibility for Dr. Gerard's medical needs. She accompanied Dr. Gerard to M.D. Anderson clinic in Houston. They went alone and stayed for several days. Shortly before his death, Dr. Gerard began living with the Crabtrees. The Crabtrees isolated Dr. Gerard from his wife, family, and friends. Those who called for him were told

that he was asleep or did not feel well and could not talk.

At least five changes were made to the trust during the period from June 20 to October 19, 1991. Each change gave more power and control to the Crabtrees. Joyce Crabtree even contacted the lawyer to make the final changes to the trust as Dr. Gerard lay on his deathbed. She dictated the changes to be made to the trust to the lawyer over the telephone. With the lawyer in attendance, the final amendment to the trust was executed at the Crabtree's residence on October 17, 1991, two days before Dr. Gerard died. The bill for the final changes was paid by Gene Crabtree as executor of the estate.

## II. PROCEDURAL HISTORY

The Crabtrees offered the Will for probate, and Violet Gerard brought a challenge to it. During the three-day trial, conflicting evidence was presented regarding Dr. Gerard's testamentary capacity and his relationship to the Crabtrees. The trial court concluded the Will had been procured through undue influence and John Gerard lacked testamentary capacity at the time of its execution. The Crabtrees appealed.

The Court of Appeals found there was evidence in the record tending to show Dr. Gerard had testamentary capacity. In addition, the Court of Appeals found nothing unwholesome about the Crabtrees' relationship with Dr. Gerard. Furthermore, the Court of Appeals' opinion states that assuming a *prima facie* showing of undue influence was made, it had been successfully rebutted by the Crabtrees. The Court of Appeals reversed the trial court's decision and ordered the trial court to admit the Will to probate. This Court granted the petition for certiorari.

## III. ANALYSIS OF ISSUES PRESENTED

### A. Testamentary Capacity

▮ The standard of review for probate proceedings is deferential to the trial court's findings of fact. This Court has stated that "an appellate court will examine and weight the record proof . . . ." *In re Estate of Mah-*

*eras,* 897 P.2d 268, 271 (Okla.1995); however, the issue of testamentary capacity "is a question of fact and the trial court's judgment will not be disturbed unless it is clearly against the weight of the evidence." *In re Estate of Carano,* 868 P.2d 699, 703 (Okla.1994); *In re Estate of Maheras,* 897 P.2d at 271–72.

▮ The rule for testamentary capacity is well established and defined. To have testamentary capacity a person must "know in a general way the character and extent of his property and understand his relationship to the beneficiary of his gift as well as his relationship to those who 'ought to be in his mind,' and he must understand the nature and effect of his act." *Carano,* 868 P.2d at 703. In determining testamentary capacity, the courts may consider such evidence of the "testator's mental status, together with his appearance, conduct, acts, habits, and conversation, both before and after execution of the will, as would tend to show his mental condition at the time of execution of the will." *In re Estate of Samochee,* 542 P.2d 498, 501–502 (Okla.1975).

▮ The trial court found the Decedent did not have testamentary capacity. It is incumbent upon this Court to examine and weigh the evidence. However, it should be noted that the "question of the probative force of evidence is in the first instance one for the trial court. There an opportunity to observe the demeanor and conduct of the witnesses is afforded which is unavailable in this court." *Prudential Fire Ins. Co. v. Stanley,* 131 P.2d 88, 90 (Okla.1942).

The record discloses that the trial court admitted documentary evidence and testimony from twenty witnesses. At least ten of those witnesses gave testimony which supports the trial court's finding of testamentary incapacity. Testimony was given that Dr. Gerard did not know what he had in his trust. Several witnesses testified that the medicine prescribed to Dr. Gerard could interfere with mental processes and cause confusion, forgetfulness, and possibly inhibit the ability to understand his relationship to other people. Testimony was also given that the cumulative effects of these drugs could affect

his business decision and knowledge of who his heirs were.

Witnesses testified that Dr. Gerard had become forgetful and was depressed. Furthermore, there was evidence he was at times child-like and unable to make up his own mind and he needed to be told what to do. Several witnesses provided examples of his confusion including: (1) attempting to pay his taxes less than two weeks after he had already paid them, (2) difficulty in following conversations and inability to answer questions about his trust, and (3) saying things then repeating them later having forgotten he had previously said them. Several witnesses, including some of those called by the appellant, testified Dr. Gerard's act of removing all mention of his wife and sister-in-law from the trust and turning over control of his assets to the Crabtrees was "out of character."

The final amendment was made on October 17, 1991. Dr. Gerard had an appointment with a doctor that morning. The deposition from the doctor states that Joyce Crabtree brought Dr. Gerard to the appointment. The doctor also states that Dr. Gerard was so weak that he was only able to give one or two word answers. In addition, he was unable to walk and had difficulty even holding his head up. Even so, later that day, Dr. Gerard made the final changes to his trust.

It should be noted that testimony was also presented by the Crabtrees and by several of Dr. Gerard's doctors that he was competent. It is this testimony that the Court of Appeals cites in defense of its reversal. However, this evidence is no more persuasive than the evidence that he lacked capacity.

■ In short, a great amount of conflicting evidence was presented by both sides in this case. However, "[t]he credibility of witnesses and the effect and weight to conflicting or inconsistent testimony are questions of fact to be determined by the trier of fact ... and, are not questions of law for this Court on appeal." *Clark v. Addison,* 311 P.2d 256, 263 (Okla.1957).

■ "Where the evidence fairly and reasonably supports the findings of testamenta-

ry incapacity ... the same will not be disturbed." *Carano,* 868 P.2d at 703. The Court concludes that the record contains sufficient evidence to allow a trier of fact to reasonably find that Dr. Gerard lacked testamentary capacity. The trial court's order is, therefore, not contrary to the clear weight of the evidence. Under the deferential standard outlined above, the order of the district court stating that the Decedent lacked testamentary capacity must be reinstated and affirmed.

## B. Undue Influence

■ The standard of review for a trial court's finding that a testator has been subjected to undue influence is the same as the standard of review regarding testamentary capacity. The law presumes that the findings of the trial court are legally correct and cannot be disturbed unless found to be clearly contrary to the weight of the evidence. *Maheras,* 897 P.2d at 271–72.

■ In *Maheras* this Court stated a two-prong test to be used to determine whether undue influence has tainted a will. First, there must be a relationship which would induce a reasonably prudent person to repose confidence and trust in another. Second, the stronger party in the relationship must have assisted in the preparation of the testamentary instrument. The following five factors are to be considered under this test:

"1. Whether the person charged with undue influence was not a natural object of the maker's bounty;

2. Whether the stronger person was a trusted or confidential advisor or agent of the will's maker;

3. Whether he was present and/or active in the procurement or preparation of the testamentary instrument;

4. Whether the will's maker was of advanced age or impaired faculties;

5. Whether independent and disinterested advice regarding the testamentary disposition was given to its maker."

*Id.* at 272–73.

This Court must apply the foregoing factors to this case. After doing so, the Court

finds support for the trial court's finding that undue influence was exerted on Dr. Gerard. First, the Crabtrees are not a natural object of Dr. Gerard's bounty. His heirs were excluded from taking under the Will. As each amendment was made to the trust, Dr. Gerard's heirs were systematically disinherited while the Crabtrees successfully solidified their control.

 Second, the Court must ascertain whether a confidential relationship existed between Dr. Gerard and Gene Crabtree. The Court now adopts the rule that imputes the activity of one spouse to the other for purposes of exerting undue influence. Thus, if either spouse maintains a confidential relationship with Decedent, then both are capable of exerting undue influence. This Court has defined a confidential relationship as one that exists whenever trust and confidence are placed by one person in the integrity and fidelity of another. *Maheras*, 897 P.2d at 273; *Fipps v. Stidham*, 50 P.2d 680, 683 (Okla.1935).

The Crabtrees assumed an increasing role in Dr. Gerard's affairs during the final months of his life. Joyce Crabtree was responsible for much of his medical care. There was testimony that Joyce Crabtree was seen climbing into bed with Dr. Gerard. She hugged and kissed him and told him she loved him. Finally, not only did Dr. Gerard spend a great deal of time at the Crabtree residence, he began to live with them shortly before his death. Therefore, the Court finds that the record supports the conclusion that Dr. Gerard placed trust and confidence in the integrity and fidelity of the Crabtrees.

Third, the Court finds that there is evidence that the Crabtrees took an active role in preparing the instruments controlling Dr. Gerard's assets. In support of this conclusion, the Court notes that testimony was given that it was Joyce Crabtree who instructed the attorney to make the final changes to the trust. Mrs. Crabtree contacted the attorney by phone and dictated the changes to be made to the trust.

Fourth, Dr. Gerard was not only of advanced age, but was fighting a debilitating illness. Furthermore, the record is replete with testimony that the medication prescribed to Dr. Gerard, including the Dilantin found in his body by an autopsy, could cause impaired mental faculties. It should also be noted that evidence was presented by witnesses of both Gene Crabtree and Violet Gerard that Dr. Gerard became severely depressed as his illness progressed.

 This Court stated in *Maheras* that if a confidential relationship was found and if the stronger party in the relationship assisted in preparing or procuring the will, a rebuttable presumption of undue influence would arise. *Maheras*, 897 P.2d at 273. The Court concludes that the record supports the finding that a confidential relationship existed and that the Crabtrees were active participants in the preparation of Dr. Gerard's testamentary documents. The presumption arises and the burden shifts to the party who desires to overcome the presumption.

 The presumption may be overcome by showing either that (1) the confidential relationship had been severed before the events in controversy or (2) the will's maker actually received independent and competent advice about the disposition of his estate. *Id.* Therefore, the Court must examine whether Dr. Gerard had the benefit of independent and disinterested advice. This Court has stated that the term independent advice means "that the donor had the preliminary benefit of conferring fully and privately upon the subject of the gift with a person who was not only competent to inform him as to its effect, but who was, furthermore, so disassociated from the interest of the donee as to be in a position to advise with the donor impartially and confidentially as to the consequences to himself of the proposed benefaction." *Carano*, 868 P.2d at 707.

An examination of the record reveals that Dr. Gerard had several conversations with his attorney during the preparation and amendments to the testamentary documents. However, the burden was on Gene Crabtree to show that Dr. Gerard had received independent advice. There is conflicting evidence about whether Dr. Gerard and his attorney ever privately discussed the effects of the various amendments. In addition, there was some evidence presented that the

attorney may not have been completely disassociated from the events in question. His contact with Dr. Gerard resulted from a partnership with the insurance company which holds the policy on the Crabtree's store.

The Court concludes that it was reasonable for the trial court to find a lack of independent advice. As stated previously, this Court will not disturb the factual findings of a trial court unless they are clearly contrary to the weight of the evidence. It should be noted that Gene Crabtree presented no evidence that the confidential relationship ended before the events in question, and in fact, the record would directly contradict such an assertion.

■ The Executor argues that neither he nor his wife are beneficiaries of the Will and are, therefore, legally incapable of exerting undue influence. This Court expressly rejected this argument in the recent *Maheras* decision. The Court stated that "[t]he gravamen of undue influence is legal harm from the wrongful exertion of power over the will's maker rather than the receipt of *personal benefit* from the offending act of influence." *Maheras*, 897 P.2d at 274. It should, however, be noted that Gene Crabtree stands to benefit indirectly from the Will since he would control a large trust where substantial fees are involved. He is the sole trustee and the duration of the exercise of his powers is discretionary and may last up to twenty-one years. Gene Crabtree was legally capable of exerting undue influence in this case.

For the foregoing reasons, the Court finds that there is sufficient evidence to support the trial court's finding that undue influence was exerted on Dr. Gerard by the Crabtrees. As previously stated, the standard of review is deferential. The trial court's decision is not clearly contrary to the weight of the evidence and must be reinstated and affirmed.

## IV. CONCLUSIONS

The Court has reviewed the record and found that it contains testimony and evidence that would reasonably support the trial court's findings of fact. That the record might also contain evidence supporting an alternative conclusion is irrelevant. The trial court had the benefit of evaluating witnesses and testimony in person. The probative value assigned to those witness by the trial court cannot be ignored. The Court finds that the trial court's order denying the Will to probate on the grounds of testamentary incapacity and exertion of undue influence was not contrary to the clear weight of the evidence.

CERTIORARI PREVIOUSLY GRANTED; COURT OF APPEALS' OPINION VACATED; DISTRICT COURT'S ORDER REINSTATED AND AFFIRMED.

All the Justices concur.