**In the Matter of the ESTATE OF Jesse Fred YOSS, Deceased.**

**Velma STUBBLEFIELD, Elsie Aguayo, Naomi Belva Coleman, Wiliam J. Yoss, Bert Robinson, Yvonne Workman, Annabelle Yoss, Fredonia Vogle, William Yoss, and Norman E. Yoss, Appellants,**

**v.**

**Laverne KEY, Appellee.**

**No. 88348.**

Court of Civil Appeals of Oklahoma, Division No. 1.

June 10, 1997.

Certiorari Denied Oct. 6, 1997.

Tim Maxcey, McAlester, for Appellants.

William J. Ervin, McAlester, for Appellee.

JOPLIN, Judge.

¶ 1. Appellants (Contestants)—four of five sisters and certain nieces and nephews of Decedent Jesse Fred Yoss—seek review of the trial court's order denying Contestants' objection to the admission of Decedent's last will and testament, by which Appellants challenged the will (1) as the product of undue influence exercised upon Decedent by Decedent's sister, Appellee Laverne Key, and (2) for Decedent's lack of testamentary capacity. After review of the record, we cannot say the trial court erred in admitting the subject will to probate over Contestant's objections and, accordingly, affirm the trial court's order.

¶ 2. Decedent, a life-long bachelor, owned a dairy farm, worked hard, and lived frugally. During his lifetime, Decedent purchased certain certificates of deposits which he held in joint tenancy with right of survivorship in his sisters and certain nieces and nephews. In 1986, Decedent executed a last will and testament appointing Laverne Key personal representative, acknowledging the joint tenancy of the certificates of deposits, ordering the dairy sold and the proceeds divided between his sisters, nieces, and nephews, and leaving the residue to Key and one other sister.

¶ 3. In 1995, Decedent became ill, and on September 29, 1995 Decedent was diagnosed with terminal leukemia. At this time, Key and her husband left their home in Tulsa and moved in with Decedent at his home near McAlester. On October 4, 1995, and at Decedent's direction, Key's husband contacted Decedent's attorney of twelve years who then visited with Decedent at Decedent's home. No family members were present at the meeting between Decedent and his attorney, nor were Key or her husband previously acquainted with the attorney. After the meeting, Key's husband was instructed to assist in procuring persons to witness Decedent's new will (non-family members) at Decedent's home. However, Decedent became ill and Decedent was admitted to McAlester Hospital. On October 5, 1995, the witnesses were directed to come to the hospital to witness the will. No family members were present during the execution of the will.

¶ 4. The Keys continued to assist Decedent in the management of his affairs, arranging for payment of bills, continuing the operation of the dairy and sale of dairy cows, and made daily visits to the hospital. Decedent's health continued to deteriorate, yet Decedent was considered competent to sign certain consent forms, refuse chemotherapy, and execute certain other instruments. Friends and family members visited Decedent at the hospital, finding him pale and physically impaired but mentally lucid.

¶ 5. Decedent died on October 13, 1995. Thereafter, Key petitioned for admission of Decedent's will to probate, to which Contestants objected. The trial court, after extensive hearing, admitted the will. Contestants appeal.

¶ 6. Contestants first assert the trial court erred in rejecting their challenge to Decedent's testamentary capacity on the day of the will's execution. We first note Decedent had apparently dictated the changes in his will prior to his admission to the hospital and the execution of the will. Second, testamentary capacity requires that:

a person know in a general way the nature and extent of his property, understand his relationship to the beneficiary of his gift as well as those who ought to be on his mind and he must understand the nature and effect of his act.

*Estate of Gerard v. Gerard*, 1995 OK 144, 911 P.2d 266, 269. Factors which may be considered in determining the existence of testamentary capacity include evidence of the testator's mental state both before and after

execution of the will "together with [testator's] appearance, conduct, acts, habits and conversation." *Matter of Estate of Samochee*, 542 P.2d 498 (Okla.1975).

▇ ¶ 7. Testamentary capacity is a question of fact: the law presumes the findings of the trial court are legally correct and the trial court's judgment will not be disturbed unless clearly against the weight of the evidence. *Matter of Estate of Maheras*, 1995 OK 40, 897 P.2d 268. In the present case, the attesting witnesses all testified Decedent appeared to possess the requisite testamentary capacity; family members described Decedent as mentally alert but physically impaired; the will itself provides for all Decedent's family members; and the will is similar in its provisions to the previous will. The only significant testimony regarding lack of testamentary capacity came from one of Decedent's physicians who opined Decedent's impending demise rendered Decedent "out of the pattern" and "not with the program." [1] We find the latter evidence insufficient to overcome the trial court's determination of the credibility of some twenty witnesses testifying to Decedent's testamentary capacity and the effect and weight to be given the entirety of this testimony. Accordingly, and after reviewing the entire record, we cannot say the trial court's finding of Decedent's testamentary capacity is clearly against the weight of the evidence.

¶ 8. Contestants next challenge the trial court's judgment admitting Decedent's will over their allegation and proof of undue influence.[2] On this issue, Oklahoma law is well-settled:

The burden of proof to first produce evidence of undue influence is upon the contestant. (Citation omitted.) ... [T]he burden is met and a presumption of undue influence attaches when the contestant establishes (1) a confidential relationship between the [testator and beneficiary] and (2) that the beneficiary (who would not otherwise be entitled to the testamentary benefits) assists in preparation or procurement of the will. (Citations omitted.) [Once shown] the burden shifts to the party seeking to take under the will to rebut the presumption. That party may do so by showing (1) the severance, or non-existence, of the confidential relationship, or (2) that the testator had competent and independent advice on the subject.

*In the Matter of the Estate of Beal*, 1989 OK 23, 769 P.2d at 150, 154. The Oklahoma Supreme Court has set out five factors to be considered in determining the presence or absence of undue influence:

(1) Whether the person charged with undue influence was not the natural object of the maker's bounty;

(2) Whether the stronger party was a trusted or confidential advisor or the agent of the will's maker;

(3) Whether he was present and/or active in the procurement or preparation of the testamentary instrument;

(4) Whether the will's maker was of advanced age and impaired; and

(5) Whether independent and disinterested advice regarding the testamentary disposition was given to its maker.

*Maheras*, 1995 OK 40, 897 P.2d at 272–273.

▇ ¶ 9. In the present case, Key was obviously the natural object of Decedent's bounty as Decedent's sister and the personal

---

1. We note here Decedent's attending physician's testimony that Decedent, as with other terminally ill patients, did not have the capacity to make business decisions. However, this physician could not state that on the date of the will's execution, Decedent lacked testamentary capacity due to either Decedent's illness or that Decedent was under the influence of prescription medication. Rather, Decedent's physician appeared to be concerned about Decedent's mental health due to Decedent's decision to, according to the physician, simply "give up." With all due respect to this physician's obvious concern with his patient's health, we cannot say this testimony alone renders Decedent's will invalid.

2. Section 61 of Title 15, Oklahoma Statutes (1981) provides:

Undue influence consists:
1. In the use, by one in whom a confidence is reposed by another, or who holds real or apparent authority over him, of such confidence of authority for the purpose of obtaining an unfair advantage over him.
2. In taking an unfair advantage of another's weakness of mind; or,
3. In taking a grossly oppressive and unfair advantage of another's necessities or distress.

representative (and residual heir) in both Decedent's 1986 and 1995 wills. Second, while Key was obviously a confidant of Decedent, Contestants adduced and we find no evidence in the record that Key exercised— to the exclusion of other family members [3]— an agency or confidential relationship with Decedent. Third, Contestants presented no credible evidence that Key actively procured the will or assisted in the preparation thereof. Fourth, although Decedent was of advanced age and suffered substantial physical impairment, Contestants failed to adduce sufficient testimony that Decedent's physical impairment rendered him mentally impaired.[4] Finally, Contestants adduced no evidence that Decedent did not receive independent and disinterested advice regarding his will, the record reflecting no family members were ever present when Decedent discussed his will with his attorney or during the execution thereof.

¶ 10. Suspicion, conjecture, possibility or guess that undue influence may have been exercised is insufficient to invalidate a will especially when such "influence" arises from natural affection; only when the influence is wrongful and, as such, confuses the judgment and control of the testator will a court find the testator's will invalid. *Matter of Estate of Carano*, 1994 OK 15, 868 P.2d 699, 706. Under the specific facts and circumstances of the present case, and discerning no evidence of such wrongful influence exercised to confuse or control Decedent, we therefore cannot say the trial court erred either in rejecting Contestant's undue influence challenge or in admitting Decedent's will to probate.

Accordingly, the order of the trial court admitting Decedent's will to probate is therefore AFFIRMED.

HANSEN, P.J., and BUETTNER, J., concur.

---

3. In this regard, we note Contestants' argument that they were "excluded" from Decedent's hospital room. However, a full review of the record reflects family members in fact had access to Decedent although at one point in time, the number of visitors was restricted.

4. Id. at footnote 1.