2007 OK CIV APP 3

**Sheila CLUCK, Plaintiff/Appellee,**

v.

**Bill FORD, Jr., as Personal Representative of The Estate of Bob Williams, Deceased, Defendant/Appellant.**

**No. 102649.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Dec. 5, 2006.

William K. Orendorff, Sallisaw, OK, for Plaintiff/Appellee.

John T. Cripps, Law Offices of John T. Cripps, Inc., Sallisaw, OK, for Defendant/Appellant.

DOUG GABBARD II, Presiding Judge.

¶1 Defendant, Bill Ford, Jr., as Personal Representative (Personal Representative) of the Estate of Bob Williams (Decedent), appeals the trial court's judgment finding that Decedent's daughter, Plaintiff, Sheila Cluck (Daughter), is the owner of the contents of a safe deposit box rented by Decedent from First National Bank of Roland. Based on the record and applicable law, we affirm.

## BACKGROUND

¶2 According to the witnesses, Decedent was an alcoholic who enjoyed gambling, but distrusted banks and often kept large sums of cash on his person or property. He had three sons and Daughter. At the time of his death, Decedent had been estranged from his sons for several years. Although he had not always been close to Daughter, he developed a close relationship with her during the last year or two of his life. He visited her home several times during this period. Daughter even served as his guardian for a short time in 1998 and 1999 after his hospitalization due to drinking. However, this guardianship was terminated at his request in January 1999 when it caused friction between himself and the woman he eventually married, Gail Van Zandt (Wife).

¶3 Both before and after the guardianship, Decedent occasionally gave Daughter money, including a $60,000 gift which she and her former husband used as a down payment to purchase a chicken business. During one of Decedent's visits to Daughter's home in the latter half of 1999 (sometime after school had started), Daughter testified, the following occurred:

He [Decedent] came to my house around lunchtime which is what he usually did. He knew I would take a lunch break from the barns and then come home. He came for a visit like he did several times that year. We sat down and talked for an hour or so about kids and farming and the weather. And right before he left, he said I want to give you something. He gave me an envelope that had a key to a safety deposit box and told me the circumstances. That he had opened a safety deposit box under an alias. He told me the name and he said he put me on the card as an alias and he told me my name. . . .

He opened it under [the name] Gene Davis for him and put me on as Sue Davis. He told me to write that down so I wouldn't forget it. I wrote it on the envelope that he gave me. He said put this up in a safe place, don't tell anybody, including Gail and you don't need what's in here until I die. He didn't tell me what was in there. I put the envelope in the safe. And after he had passed away, a few days after that, I contacted the bank.

When asked if she felt like she could access the box at any time, Daughter stated:

No. I didn't want to try. He told me to go down there and sign the signature card as Sue Davis. . . . That sounded funny to me to go in there and say I was somebody that I wasn't, and so I talked to Greg [Daughter's former-husband] about it and I said I don't want to do that. We'll just wait until the time comes that he passes away. . . .

The safe deposit box lease agreement is dated July 14, 1998. It purports to create a "joint tenancy" account in the names of "Gene Davis or Sue Davis," but is only signed by "Gene Davis." Although Daughter saw Decedent a few times after he gave her the key, Decedent never spoke about the box again and never requested return of the key.

¶4 Daughter last saw Decedent in January 2000, a month before he married Wife. Daughter testified she did not learn about the marriage until after Decedent's death in July 2000. Daughter kept the key, and, a few days after Decedent's death, contacted the bank in order to access the safe deposit box. The bank refused to allow anyone to access the box until a personal representative was appointed for Decedent's estate and obtained a court order. Eventually an order was obtained; the bank opened the box and found it contained $184,775. Daughter then brought this action, claiming the cash.

¶ 5 Wife, Decedent's widow, stated she became aware of the safe deposit box in late September or October of 1999, after Decedent complained to her that he had attempted to access the box but had not been allowed to do so by bank employees. However, the bank's "record of access" to the box was admitted into evidence and reflects that "Gene Davis" was allowed to access the box fairly regularly until September 1999, but did not access it thereafter.

¶ 6 Witnesses also testified that Decedent had established a trust in which he had named Daughter the trustee and sole beneficiary. However, in March 2000, Decedent changed the terms of the trust, naming his financial advisor as trustee and Wife as primary beneficiary. According to the testimony of Wife and the financial advisor, Decedent was upset with Daughter because of an article that appeared in a local newspaper in October 1999. In the article, Daughter and her family had been given an award as the county's "farm family" of the year, and had failed to give Decedent credit for assisting them.

¶ 7 A non-jury trial was held in April 2005. In September 2005, the trial court issued an order finding that Daughter was the owner of the cash contained in the safe deposit box. Personal Representative now appeals, asserting as error that: (1) Daughter did not prove the elements needed to establish an inter vivos gift from Decedent; and (2) Daughter did not establish a joint tenancy in the contents of the safe deposit box.

## STANDARD OF REVIEW

¶ 8 On appellate review of a judgment in a case of equitable cognizance—as is the case at bar—"an appellate court will examine and weigh the evidence. Only if the findings and judgment of the district court are clearly against the weight of the evidence, will they be reversed." *In re Estate of Estes*, 1999 OK 59, ¶ *28*, 983 P.2d 438, 445; *see also In re Estate of Stinchcomb*, 1983 OK 120, ¶ *18*, 674 P.2d 26, 30.

## ANALYSIS

¶ 9 Following the death of an alleged donor, the burden of proving that the donor made an inter vivos gift requires evidence that is "clear, explicit, and convincing as to every element" needed to establish the gift. *Estes* at ¶ 30, 983 P.2d at 445. The requisite elements of proof are: (1) a donor competent to make the gift, (2) freedom of will on his or her part, (3) an intention by the donor to make the gift, (4) a donee capable of accepting the gift, and (5) delivery by the donor and acceptance by the donee. *Davis v. Nat'l Bank of Tulsa*, 1960 OK 151, 353 P.2d 482 (court syllabus # 4). Usually, the gift must also "go into immediate and absolute effect with the donor relinquishing all control." *Estes* at ¶ 29, 983 P.2d at 445. However, the donor "may attach certain lawful conditions precedent to the vesting of title in the donee," and "may limit a gift by conditioning it upon an expected state of facts, so that if that state of facts fails, the gift fails with it." 38 Am.Jur.2d *Gifts* § 72 (1999).

¶ 10 Under Oklahoma law, in the absence of an actual delivery, delivery of an inter vivos gift cannot be established after a donor's death solely by proof of the donor's declaration. *Davis*, 1960 OK 151, 353 P.2d 482 (court syllabus # 1). However, "[l]ess proof is required to sustain a gift inter vivos to a ... blood relative than if it had been one to a stranger." *Foster v. Rose*, 1951 OK 341, 238 P.2d 332 (court syllabus # 2). "The facts and circumstances surrounding the parties, their relationship, and the direct expressions of the decedent should all be taken into consideration in determining the intention of the donor." *Id.* at ¶ 11, 238 P.2d at 334.

¶ 11 Review of the record in the case at bar reveals abundant evidence to support a finding that Decedent in fact *intended* to make a gift of the safe deposit box and its contents to Daughter, and that he effected delivery. Not only did Decedent tell Daughter he wanted her to have the contents, but he gave her a key to the box, thereby constructively delivering the box and its contents to her.

¶ 12 The evidence also would support a finding that Decedent relinquished control over the contents of the box. Although Wife gave testimony suggesting that this relin-

quishment may not have been voluntary, bank records suggest that Decedent quit accessing the box after he delivered the key to Daughter, thus supporting a finding that Decedent relinquished control thereof. However, to be valid, a gift must also be accepted by the donee.

■ ¶ 13 Generally, acceptance of a gift may be implied or presumed in certain instances, including situations where the gift will inure to the benefit of the donee, or where the gift is from a parent to a child. 38 Am.Jur.2d *Gifts* § 88 (1999); *see also Foster v. Rose,* 1951 OK 341, 238 P.2d 332. However, no person is required to accept an unwanted gift. In addition, a person may delay or postpone the acceptance of a gift. However, to be valid, a gift must be accepted before revocation by the donor or revocation by virtue of the donor's death. 38 Am.Jur.2d *Gifts,* § 33 (1999).

■ ¶ 14 Here, conflicting evidence was presented regarding the time of acceptance. On the one hand, Daughter accepted the key to the safe deposit box, kept it, never offered to return it, and only attempted to access the box after her father's death as he had instructed when he told her "you don't need what's in here until I die." This evidence indicates that Daughter accepted the gift when Decedent gave her the key, and that her subsequent actions were simply in compliance with her father's wishes. On the other hand, evidence that Daughter did not immediately sign her name to the signature card because she was uncomfortable with signing a false name suggests that she did not accept the gift until it was already revoked by her father's death.

¶ 15 In this case, the trial court concluded that Daughter accepted the gift by taking and possessing the key to the safe deposit box. Where there is conflicting evidence, the trial court's determination will not be set aside unless the determination is clearly against the weight of the evidence. *In re Estate of Gerard,* 1995 OK 144, 911 P.2d 266; *Briggs v. Sarkeys Inc., 1966 OK 168, 418 P.2d 620.* We are unable to find that the trial court's conclusion is clearly against the weight of the evidence. Accordingly, Person-

al Representative's proposition of error on this ground fails.

■ ¶ 16 Personal Representative also asserts the evidence failed to prove that a joint tenancy with a right of survivorship was established in the *contents* of the safe deposit box.

■ ¶ 17 Joint tenancy in an account or other personal property may be established two ways: (1) by express language in the instrument creating the account that contains language referring to survivorship; or (2) by actions of the parties "which show an intention to create the essential elements of joint ownership and survivorship." *In re Estate of Ingram,* 1994 OK 51, ¶ 9, 874 P.2d 1282, 1285. As to safe deposit boxes, the Oklahoma Supreme Court has specifically held that proof of a joint tenancy in the *contents* of a safe deposit box is not established solely from the existence of a joint lease. In *In re Estate of Stinchcomb,* 1983 OK 120, 674 P.2d 26, the Supreme Court stated:

[A]bsent an express agreement that the *contents* of a safe deposit box shall be joint property, a joint lease in and of itself alone, does not create a joint tenancy in the contents of the box.

*Id.* at ¶ 15, 674 P.2d at 29–30 (emphasis added).

¶ 18 In the present case, the safe deposit box lease agreement does not contain any express language indicating the creation of a joint tenancy with a right of survivorship. However, the parties' actions clearly show such intent. Decedent gave Daughter a key to the safe deposit box, and then advised her "you don't need what's in here until I die." Daughter accepted the key and waited to retrieve the contents of the box until her father's death, as he had requested. Both parties understood that Daughter was entitled to the entire contents of the box upon Decedent's death. We find that the parties entered into an agreement to hold the contents of the safe deposit box in joint tenancy with right of survivorship. Accordingly, the trial court's judgment was not contrary to the clear weight of the evidence on this ground, as well.

## CONCLUSION

¶ 19 For the reasons set forth above, the decision of the trial court finding that Daughter is the owner of the safe deposit box and its contents is affirmed.

¶ 20 AFFIRMED.

RAPP, V.C.J., and REIF, J., concur.