769 P.2d 150 (1989)
In the Matter of the ESTATE OF Poley BEAL, Deceased.
Odesta B. THOMPSON, Appellant,
v.
Troy GAMMON, Appellee.
No. 65726.
Supreme Court of Oklahoma.
February 14, 1989.
James O. Braley, Durant, for appellant.
James D. Thornley, Atoka, Sp. Adm'r for the Estate of Poley Beal.
*151 SUMMERS, Justice.
The appeal arises out of a will contest. Our deceased was Napoleon "Poley" Beal of Atoka, and tendered for the trial court's evaluation were two instruments, each offered by a different beneficiary as being the last will of Poley Beal. After a full hearing the trial court admitted neither will to probate, and appointed a Special Administrator to handle the estate of the intestate decedent. Odesta Thompson, proponent and sole beneficiary of what we shall refer to as the first will (it was executed and likewise offered for probate first in time) appeals. Troy Gammon, her counterpart as to will number two, does not. The Special Administrator has filed herein his brief in support of the trial court's Order resulting in his appointment.
Will number two was rejected by the lower court for its failure to have been executed in conformity with statutory requirements, and that decision, being final, is not before us. The first will, however, was ultimately turned away because the court found it a product of undue influence by its proponent. We say "ultimately" because the court's original ruling on December 23, 1985, although finding that Poley Beal "decided in his own mind that he had been the victim of undue influence by Odesta", stopped short of making a judicial finding of undue influence. Rather the court at that time ruled that will number one was revoked by the invalidly executed will number two.
But after a timely filed Motion for New Trial (and "Motion for Reconsideration") the trial court, having determined that the matter should be reconsidered, issued its Order of February 10, 1987, completely supplanting the earlier one, and in which it found that her actions did amount to undue influence rendering the will invalid. That is the Order from which her appeal now comes before us. We affirm.
There is a preliminary matter pending here on which we have deferred a ruling until merits adjudication. That is a Motion filed by Odesta Thompson to Reject special Administrator's Brief. Her argument is that the Special Administrator has no pecuniary interest in the outcome, no express authority to file a brief on appeal, and in essence, no standing. A Special Administrator is a creature of statute, specifically 58 O.S. 1981 § 211. He exists to provide general administration when there is a delay or uncertainty in granting letters *152 testamentary or of administration, such as in the event of a will contest. Jersak v. Risen, 194 Okl. 423, 152 P.2d 374 (1944). Although his powers are limited to those granted him by statute, Hooker v. Hoskyns, 328 P.2d 404 (Okl. 1958), we do not believe the Oklahoma statute forbids his appearance in this appeal. Among the "duties of special administrator" set forth in 58 O.S. 1981 § 215, along with the duty to take charge and management of the estate, is the authority to "commence and maintain or defend suits and other legal proceedings, as an administrator." We note that his brief makes no effort, for example, to promote will number two ahead of will number one. It merely argues the sufficiency of the evidence to legally support the Order by which he was appointed. In doing that he has not exceeded his statutory authority, and the Motion to Strike Brief is denied.
A will contest presents a matter of equitable cognizance. In re Hess' Estate, 379 P.2d 851 (Okl. 1962). On appeal of such a matter we are obliged to review and weigh the evidence, but the judgment of the trial court will not be disturbed unless clearly against the weight of the evidence. White v. Palmer, 498 P.2d 1401 (Okl. 1971).
When he met Odesta Thompson in 1976 Poley Beal was a 76 year old widower. Within a month she moved in with him, where she was to live for the next eight years. In her words "he was alone, in frail health, and ... unable to care for himself."[1] He had social security income, his own home, and 160 acres of land. She at that time was 58 years of age and had income of $300.00 per month. Although there were some testimonial references to living as man and wife no attempt was made at trial to establish a common law marital relationship. By her testimony she cooked for them, cleaned the house, bathed him, gave him medicine, transported him to the doctor, and grocery shopped with her own money.
In 1982 she transported him to the office of Attorney B for the purpose of his making a will. The will was prepared, leaving all to Odesta. They met again with the attorney for its execution and attestation at the Atoka County Court House. By this time Poley was very hard of hearing. In that meeting Poley wondered what would happen if Odesta died before he did. In order to resolve that he asked Odesta, who was waiting in the hall. She supplied the name of her niece to take all if she predeceased Poley, and a clause to that effect was inserted in the will. This was will number one.
Will number two was made in the hospital, just five days prior to Poley's death in 1985. According to Troy Gammon, a courthouse official and cousin of Poley's, Poley had decided Odesta and Attorney B were trying to get his property. Odesta had been appointed his conservator in 1984, and Poley wanted Gammon to help have her removed. He asked that Gammon (without any lawyer's assistance) prepare a will leaving all to Gammon, which was done. The will was duly signed by Poley and two witnesses and was offered for probate as will number two.
The treating physician testified that in his final days Poley suffered from hardening of the arteries, emphysema, shingles, and that he was acutely ill and thin. Notwithstanding that the trial court found that at all times relevant to the action (both will signings) Poley Beal was "competent and of sound mind." That finding has not been appealed. Will number two was rejected by trial court as not being in statutory compliance.[2] Layman and would-be beneficiary Gammon has accepted the ruling without appeal.
Will number one was likewise refused probate. In its final Order the trial court found that Poley decided in his own mind that he had been the victim of undue influence by Odesta, that he had determined to *153 revoke the earlier will, and that as a result of his experiences he did not trust having a lawyer prepare a will but rather asked Troy Gammon to do it for him. The court further found that will number one had in fact been the product of undue influence by Odesta Thompson, and was thereby invalid.[3]
There are some other facts that were before the trial court bearing upon Poley Beal's property and Odesta's interest therein.
1. In 1978 a deed was executed from Poley to Odesta describing the 160 acres. It was recorded in 1982. In January 1984 she quitclaimed it back. This litigation involves neither deed.
2. In 1983 a contract for sale of the 160 acres for $75,000.00 was made with a third party, naming Poley Beal and Odesta Thompson as grantors.
3. In June of 1984 Odesta was appointed Poley's conservator. He had been moved to a nursing home in Talihina. Poley allegedly told one witness (Mrs. Gammon) he didn't want to sell his land but "Odessa [sic] just told him he was going to have to sell it because Mr. B [attorney B] was going to force him to sell it." (Tr. 138)
4. In August 1984 the sales proceeds were delivered to Odesta, as conservator. As of the date of the hearing no accounting had been furnished as to most of those funds, although an accounting had been requested and ordered. (Tr. 188, 189)
5. On August 28, 1984 attorney B sent Poley a letter, stating it to be on behalf of Odesta, requesting pay at $55.00 a week from October 1976 to June, 1984 in the sum of $20,000.00. At trial attorney B testified that the letter was his idea, not Odesta's, (Tr. 165), that he had been representing both of them for many years (Tr. 167), but finally (Tr. 173) that he was representing Odesta, not Poley, when he wrote the letter.
(Since the hearing Odesta filed a claim against the estate for $49,300.00 [$100.00 a week] for her services, and when it was denied she instituted the court action for that sum referred to in footnote 1.)
6. Finally there was the testimony of Carlene Smith. She testified she was once the caretaker of an elderly gentleman in Durant, whose wife had recently died. In fact he was a distant relative of Poley Beal named James Beal. James Beal asked the witness to take some papers to attorney B's office on her way home, and she did so. The papers were concerned with rewriting Mr. Beal's will, "and we went into [attorney B's] office and he said to me that he could fix it to where when Mr. Beal passed away that I could get everything that Mr. Beal had, and I told [attorney B] that I didn't want anything that belonged to Mr. Beal. I wasn't that kind of person and I just turned around and walked out." (Tr. 54).
Our remaining task is to analyze the law of undue influence to see if the evidence here supports the trial court's use of that rule to reject the first will. Section 43 of Title 84 provides the Oklahoma codification:
"A will or part of a will procured to be made by duress, menace, fraud or undue influence, may be denied probate... ."
Our cases adopt the well settled rule that undue influence such as to invalidate *154 a will must destroy the free agency of the maker and in effect substitute the will of another for that of the testator. In re Samochee's Estate, 542 P.2d 498 (Okl. 1975); Hubbell v. Houston, 441 P.2d 1010 (Okl. 1967). Due in large part to the fact that the person claimed to have been the victim of the undue influence is dead and cannot testify, we recognize that ordinarily the issue is capable of proof only circumstantially. White v. Palmer, 498 P.2d 1401 (Okl. 1971). The contestant is not confined to the facts he is able to present, but is entitled to the normal inferences which may be derived therefrom. White v. Palmer, supra; In re Cook's Estate, 175 P. 507 (Okl. 1918). In McCarty v. Weatherly, 85 Okl. 123, 204 P. 632, 638 (1922) we said:
"To establish undue influence it is not necessary that there be direct testimony that threats were made or even persistent entreaty or persuasion was brought to bear upon the mind of the testatrix. It is sufficient that, if from all the surrounding circumstances connected with the making of the will it appears that any undue influence has been exercised, the court should not admit the will to probate. In determining the question of undue influence, the court should take into consideration the association of the parties, the opportunity for undue influence afforded the person who is especially favored by the terms of the will, the effect of the will upon those persons whom we would naturally expect to be the receipients of her bounty. But opportunity for undue influence, standing alone, is not sufficient to establish undue influence.
The burden of proof to first produce evidence of undue influence is upon the contestant. In re Lillie's Estate, 195 Okl. 597, 159 P.2d 542 (1945). There is an old and unbroken line of authority, however, stating that the burden is met and a presumption of undue influence attaches when the contestant establishes (1) a confidential relationship between the two and (2) that the beneficiary (who would not otherwise be entitled to the testamentary benefits) assists in preparation or procurement of the will. Hubbell v. Houston, supra; Myers v. Myers, 130 Okl. 184, 266 P. 452 (1927). In that event the burden shifts to the party seeking to take under the will to rebut the presumption. That party may do so by showing (1) the severance, or non-existance, of the confidential relationship, or (2) that the testator had competent and independent advice on the subject. White v. Palmer, supra, Hunter v. Battiest, 192 P. 575 (Okl. 1920). What kind of independent advice?
"Independent advice has been held to mean the testator had the benefit of conferring fully and privately about the consequences of his intended will with a person who was not only competent on such matters, but who was so disassociated from the interest of the beneficiary named there as to be in a position to advise with the testator impartially and confidentially. Anderson v. Davis, 208 Okl. 477, 256 P.2d 1099 [(1952)]." White v. Palmer at 1406.
A "confidential relationship" is generally synonymous with a "fiduciary relationship," Blacks Law Dictionary 4th Ed P. 370, and exists whenever trust and confidence are placed by one person in the integrity and fidelity of another. Fipps v. Stidham, 174 Okl. 473, 50 P.2d 680 (1935). Some jurisdictions appear to draw a distinction between the two terms, saying that a "confidential relation" may exist although there is no "fiduciary relation". See e.g. Merritt v. Easterly, 226 Iowa 514, 284 N.W. 397 (1939); Floyd v. Green, 238 Ala. 42, 188 So. 867 (1939); Kudokas v. Balkus, 26 Cal. App.3d 744, 103 Cal. Rptr. 318 (1972). In practice and result, however, no distinction appears. These latter courts are but using a narrower, more classical definition of fiduciary such as attorney-client, guardian and ward, etc., and invariably they go on to find a "confidential relation" if the facts support a relation of confidence that meets the general definition set out above. Oklahoma is simply in line with the majority of jurisdictions[4] which treat the terms *155 alike semantically as well as justicially. We approve of the explanation in In re Null's Estate, 302 Pa. 64, 153 A. 137 (1930):
"`Confidential relation' is not confined to any specific association of parties. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. Where one is bound to act for the benefit of another, he can take no advantage to himself. No precise language can define the limits of the relation; it generally exists between trustee and cestui que trust, guardian and ward, attorney and client, and principal and agent. In such cases, the "confidential relation" is a conclusion of law; in others, as parent and child, it is a question of fact to be established by the evidence."
It has also been said that equity will never bind itself to any hard and fast definition of the phrase "confidental relation." Egr v. Egr, 170 Or. 1, 131 P.2d 198 (1942). A review of our decisions shows we agree. We have declared relationships confidential between bank officer and borrower, Fipps v. Stidham, supra, employer and employee, Lewis v. Schafer, 163 Okl. 94, 20 P.2d 1048 (1933), and brothers, Sellers v. Sellers, 428 P.2d 230 (Okl. 1967). In each case we have looked at the facts and found a relationship which would allow a reasonably prudent person to repose confidence in the other.
In will contest cases we have considered as potentially confidential such relationships as illicit lovers, In re Estate of Newkirk, 456 P.2d 104 (Okl. 1969), nephew and uncle, Hubbell v. Houston, supra, secretary, maid, chauffeur and their employer, In re Lillie's Estate, supra, and sisters, In re Martins' Estate, 261 P.2d 603 (Okl. 1953). In these cases the will contestants failed to establish the presumption, showing in none the required degree of active participation in preparation of the will. In Hubbell we held that the mere presence of the beneficiary in the room at the time of execution does not constitute such "active" participation. In In re Lillie's Estate the fact that the secretary-beneficiary typed the will in response to testator's commands did not constitute active procurement, particularly where no one beneficiary was the principal beneficiary under the will.
The presumption referred to does not ordinarily arise (or fail to arise) in a vacuum of other facts. A confidential relationship for undue influence purposes is not going to arise (absent a strict classical fiduciary relationship) merely by reason of the nominal relationship (nephew to uncle, secretary to employer, banker to customer, etc.) The courts before declaring the relationship confidential will require a relation where there is weakness on one side and strength on the other resulting in dependence or trust justifiably reposed in the stronger. Thus the condition of the testator is always of critical importance. See e.g. Anderson v. Davis, supra, where we said "what degree of influence will vitiate a will depends much upon the bodily or mental vigor of the testator" (syllabus 2). In Newkirk, supra, the contestant failed because the meretricious relationship, though nominally confidential, did not result in disparate positions of bodily or mental strength or weakness and there was no resulting abuse of confidence.
That a confidential relationship existed in the case at bar seems irresistable. In Matter of Swenson, 48 Or. App. 497, 617 P.2d 305 (1980) a confidential relationship was adjudged where the beneficiary was decedent's "friend," bathed decedent, gave her drugs, shopped for her, wrote her checks, and transported her. The nominal *156 relationship between Poley and Odesta plus the factual disparity in strength and dependence firmly establishes its nature as confidential.
Only when that relationship is coupled with active participation in procurement or preparation of the will does the presumption arise. Odesta in this regard did much more than simply drive Poley to the lawyer's office and court house. When in the process of execution itself he wondered who would get his property if she died first, she literally supplied the name of the contingent beneficiary, her niece. If she dictated the disposition of Poley's property should she die first, it was not unreasonable for the trial judge to infer that she likewise dictated its disposition if she did not die first. The active participation was established and the presumption of undue influence sprang up.
No evidence was offered to show Poley received independent, disinterested advice before willing her his all, or to otherwise rebut the presumption. The Order and Judgment of the trial court was not contrary to the clear weight of the evidence, and is therefore affirmed.
HARGRAVE, C.J., OPALA, V.C.J., and LAVENDER, SIMMS, DOOLIN, ALMA WILSON and KAUGER, JJ., concur.
NOTES
[1] Petition for Money Judgment Quantum Meruit, No. C-87-29, District Court of Atoka County, filed by Odesta Thompson February 25, 1987.
[2] The record would support a finding that will number two failed, among other possibilities, for want of the testator to declare to the witnesses that the instrument was his will. See 84 O.S. 1981 § 55(4).
[3] The court also found, as it had in the prior supplanted Order, that Poley's lack of possession of the first will prevented him from physically destroying it, but that the second will, even though statutorily defective, operated to revoke the first. That part of the ruling was clearly error. 84 O.S. 1981 § 101 provides:

"Except in the cases in this article mentioned no written will, nor any part thereof, can be revoked or altered otherwise than:
1. By a written will or other writing of the testator, declaring such revocation or alteration, and executed with the same formalities with which a will should be executed by such testator; or,
2. By being burnt, torn, canceled, obliterated or destroyed, with intent and for the purpose of revoking the same, by the testator himself, or by some person in his presence and by his direction." (Emphasis added).
The statutory methods for revocation of a will are exclusive. In re Cabaniss' Estate, 191 Okl. 340, 129 P.2d 1003 (1942). The Order denying will number one to probate can only be affirmed if the lower courts' ruling on undue influence is allowed to stand.
[4] Van't Hof v. Jemison, 291 Mich. 385, 289 N.W. 186 (1939); Barker v. Barker, 75 N.D. 253, 27 N.W.2d 576 (1947); In re Stewart's Estate, 354 Pa. 288, 47 A.2d 204 (1946); Griffith v. Scott, 128 Okl. 125, 261 P. 371 (1927); Scott v. Brown, 90 Ind. App. 367, 157 N.E. 64 (1927); McCown v. Fraser, 327 Pa. 561, 192 A. 674 (1937); Sachs v. Cluett, Peabody & Co., 265 A.D. 497, 39 N.Y.S.2d 853 (1943); Sewell v. Ladd, 158 S.W.2d 752 (Mo. 1942); Peyton v. William C. Peyton Corporation, 23 Del. Ch. 321, 7 A.2d 737 (1939); Gerson v. Gerson, 179 Md. 171, 20 A.2d 567 (1941); In re Eakle's Estate, 33 Cal. App.2d 379, 91 P.2d 954 (1939); and Thomas v. Whitney, 186 Ill. 225, 57 N.E. 808 (1900).