# UNITED STATES COURT OF APPEALS

**Filed 1/22/97**

## TENTH CIRCUIT

| | |
|---|---|
| KENNETH RAY JOHNSTON, | |
| Plaintiff-Appellant, | |
| v. | Case No. 95-6295 |
| DORTHA NELL GOSS, individually and as Trustee of the Ray Johnston Living Trust, | (D.C. CIV-94-1465-A) (Western District of Oklahoma) |
| Defendant-Appellee. | |

---

## ORDER AND JUDGMENT[1]

---

Before ANDERSON, HENRY, and MURPHY, Circuit Judges.

---

In this appeal we consider whether the district court, sitting in diversity jurisdiction, properly granted summary judgment to the defendants against a claim that an Oklahoma inter vivos trust was obtained through undue influence. We determine that jurisdiction is proper under 28 U.S.C. § 1332(a)(1) and Rule 4(a) of the Federal Rules of Appellate Procedure.[2] Because we conclude that the evidence raises a triable issue as to

---

[1]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[2]Although we determine that jurisdiction is proper in this case, see Skrzypczak v. Kauger, 92 F.3d 1050, 1052 (10th Cir. 1996) (observing that if an appellate court has

~~whether the trust was obtain~~ed through undue influence, we vacate the judgment of the

questions about jurisdiction, it raises them sua sponte), we note that it is the rare case where we will decide matters that could be resolved in the probate courts, and we express serious reservations about reaching claims that are artfully pled so as to accomplish federal jurisdiction. In deciding whether we have jurisdiction over an action that could be brought in state probate court, we are guided by our decision in McKibben v. Chubb, where we noted that "[f]ederal courts have only limited power in probate matters and may not probate or administer a will." 840 F.2d 1525, 1529 (10th Cir. 1988). We further held in McKibben that "[w]hen a claim is brought charging undue influence or fraud in the execution of a will, that action is ancillary to the challenge of the will and belongs in the [state] probate proceedings, not in federal court." Id. at 1530 (footnote omitted).

 Here, Mr. Johnston alleged in his complaint that the appellees "intentionally and tortiously interfered with [his] expectancy of inheritance by exerting undue influence over Father in obtaining the Trust. . . ." Aplt's App. vol. I, at 6. As an alternative ground for relief, he asked the court to vacate the trust. The fact that he challenges the validity of the trust, rather than the will, would not prevent Mr. Johnston from bringing essentially the same claim in probate court. Although the record does not reflect the precise relationship between the challenged trust and the will that was executed on the same day, it appears that Mr. Johnston's claim is substantially similar to the claim that was brought in Oklahoma probate court in Estate of Gerard v. Gerard, 911 P.2d 266 (Okla. 1995). Nonetheless, the district court, after having the issue briefed by the parties, concluded that because Mr. Johnston was challenging the validity of the trust, rather than the will itself, federal jurisdiction was proper. The court reasoned:

> Pursuant to Okla. Stat. tit. 60 § 175.23, the district courts of Oklahoma have jurisdiction over trust agreements. This case involves an inter vivos trust, which, if dissolved, would affect the settlor's testamentary scheme. Nevertheless, the Court finds that the action is properly before the Court, as such actions are not exclusively relegated to the jurisdiction of the probate courts.

Aplt's App. vol. II, at 610 (the district court's order). This reasoning is sound, and we adopt it. See McKibben, 840 F.2d at 1529 (explaining that federal courts sitting in diversity have subject matter jurisdiction over matters that state law prescribes to the state courts of general jurisdiction).

 However, we emphasize that it is the involvement of the trust rather than the characterization of the action as a tort that confers federal jurisdiction in this case. Ordinarily, characterizing a will contest as a claim in tort for damages will not overcome the jurisdictional hurdle described in McKibben. See Beren v. Ropfogel, 24 F.3d 1226, 1228 (10th Cir. 1994) (refusing jurisdiction over a tort claim "covering the time period immediately preceding and including the actual execution of [a] will").

2

district court and remand for further proceedings consistent with this opinion.

This case involves a challenge by plaintiff-appellant Kenneth Ray Johnston ("Mr. Johnston") to the validity of a revocable living trust executed in 1992 ("the Trust") by his now-deceased father, David Ray Johnston (referred to by the parties, and therefore in this order, as "Father"). The younger Mr. Johnston, a resident of Florida, brought this action in the United States District Court for the Western District of Oklahoma. Mr. Johnston claims that his sister, defendant-appellee Dortha Nell Goss, exerted undue influence over their father, who was ninety-three years old when he executed the challenged instrument, resulting in a disposition of Father's property that was, relative to two prior wills, unfavorable to Mr. Johnston and his heirs and favorable to both Ms. Goss and a younger sister, Dorris Kay McPherson, as well as their heirs. The defendants moved for summary judgment. The district court granted the motion, holding that Mr. Johnston had failed to raise a triable issue of fact as to the question of undue influence, in an order from which Mr. Johnston now appeals.

## I. BACKGROUND

Because we are reviewing a grant of summary judgment for the defendants, we present the facts below as we are required to view them--in the light most favorable to Mr. Johnston. See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal &

3

Prof'l Publications, Inc., 63 F.3d 1540, 1545 (10th Cir. 1995), cert. denied, 116 S. Ct. 702 (1996).

All three of the Johnston children were born and raised on a farm in Texas County, Oklahoma. Mr. Johnston, the eldest of the children, went to college at Oklahoma A & M and then went on to a career as a jet fighter pilot in the Air Force before retiring to Tampa, Florida in 1977. Ms. Goss attended college in Oklahoma for a year and then lived in various places in California, Oklahoma, Texas and New Mexico with her husband, a Baptist minister, before settling in Adams, Oklahoma in 1981. Ms. McPherson lives in Denver, Colorado. In addition to the farm in Texas County, family land holdings included 240 acres of farm land with mineral rights, which the children's mother inherited from her parents ("the Jennings Place"). Their mother passed away in 1978, and Father never remarried.

In 1983, Father executed a will ("the 1983 Will") which would have provided each of his three children with essentially equal shares of his property. Father also began a four-year process of deeding specific portions of the Jennings Place to each child.

Father experienced health problems beginning at least in 1979. After Ms. Goss moved to Adams in 1981, she lived near Father and helped to care for him. She helped him recover from kidney surgery; after he had hip replacement surgery, she went places with him, assisted on the farm, and checked on him to make sure that he was okay. After he had knee replacement surgery, Ms. Goss stayed with him several hours a day, and after

he was discovered to have heart trouble, she went to his house several times a week to help with the house, to do laundry, or to accompany him on visits to the doctor. For many years Ms. Goss made daily phone calls to Father, and Father called her at the beginning and end of each day.

Father gave Ms. Goss access to his checking account, and she frequently drew cash and paid some of her personal bills out of this account. Her son, Jack, leased Father's farmland on favorable terms and borrowed farming equipment and machinery free of charge from Father.

Ms. Goss knew a financial planner named Jess Murphy. Beginning in about 1990, Ms. Goss would occasionally see Murphy in the street and would tell him that Father needed to do some financial planning and that she would contact Murphy about it. In October 1992, Ms. Goss called Murphy and scheduled an appointment for her and Father. Ms. Goss brought Father to Murphy's office on October 22, 1992, and the three of them were present during a meeting in which the preparation of a trust was discussed. Murphy testified that the meeting lasted two hours and that the following exchange took place at the start of the meeting:

> First I asked [Father] if he would desire to meet with me alone or whether he would prefer to have Mrs. Goss in the meeting with us. He asked her if she wanted to be there and Mrs. Goss said, "That's up to you, Dad." And he said, "Well it's fine with me if she's here."

Aplt's App. vol. I, at 266 (Deposition of Jess Murphy). After the meeting, Murphy sent Ms. Goss a letter which read:

5

OCTOBER 28, 1992

MRS. DORTHA GOSS
BOX 586
ADAMS, OK. 73901

DEAR DORTHA:

I VERY MUCH ENJOYED VISITING WITH YOU AND YOUR
FATHER.  YOUR FATHER IS AMAZINGLY SHARP FOR HIS AGE.

I'VE ENCLOSED A SUMMARY OF WHAT WE DISCUSSED AND AN
OUTLINE OF THE TRUST.  I VISITED WITH MIKE BORING
BRIEFLY IN GENERIC TERMS AND HE STATED THAT THE FEES
WOULD NOT RUN MORE THAN $1,500 AND WOULD PROBABLY
BE LESS.

I'LL GIVE YOU A CALL IN A COUPLE OF DAYS TO SEE IF YOU
WANT TO PROCEED.  AGAIN, I ENJOYED THE VISIT AND LOOK
FORWARD TO THE POSSIBILITY OF BEING OF FURTHER
SERVICE TO YOU IN THE FUTURE.


SINCERELY,

JESS MURPHY

Aplt's App. vol. I, at 275.  Murphy attached to this letter a summary of the proposed Trust

and a catalog of Father's assets based on information that was gathered by Ms. Goss and

Father.

Murphy's day timer for November 1992 contains "reminders" that referred to

"Dortha Goss-Johnston" and "Dortha Goss" and an entry for November 13th which reads

"Dortha Goss/Mr. Johnston."  Murphy testified that he could not recall ever speaking to

Father on the phone prior to the execution of the Trust and that he probably called Ms.

Goss to tell her about his discussion with the lawyer, James M. Boring.[3]  On November 13, 1992, Murphy, Ms. Goss and Father met again in Murphy's office, probably for less than an hour, to discuss Murphy's consultation about the Trust with Boring, and to schedule a date for the Trust closing.

On November 19, 1992, Ms. Goss accompanied Father to the office of attorney Boring for the Trust closing.  Boring had not previously met Father and does not recall whether he ever spoke to Father on the phone before the closing.  Boring had prepared a forty-five-page Trust based on a summary prepared by Murphy and conversations with Murphy.  Murphy had also provided Boring with a copy of the 1983 Will.  Boring testified that he went over the Trust with Father in the presence of Ms. Goss.  Boring testified that Father "wanted to skip Kenneth [Johnston]" as a successor trustee.  Aplt's App. vol. I, at 111 (Deposition of James M. Boring).  Boring also testified that Father said he feared that Mr. Johnston would sell the property and that he did not want Mr. Johnston to be able to do so, but Boring did not recall why Father thought Mr. Johnston would sell the property.  Boring further testified that Father had said he did not want any portion of the Trust to go to Mr. Johnston's heirs, but again did not recall Father indicating why that was so.  Id. at 116.  Finally, Boring testified that during the meeting, Father asked Ms. Goss for her opinion several times, and that each time Ms. Goss would answer, "Dad, this is your property, it's your Trust.  It's up to you.  You do what you want to do."  Id. at 121.

---

[3]James M. Boring is sometimes referred to in the record as "Mike".

7

Boring was paid $1,500.00 by a check that was signed by Father but filled out by someone other than Father or Ms. Goss. Murphy was paid $500.00 by a check that was made out and signed by Ms. Goss.

The Trust contained significant changes as compared with the 1983 Will in the share of the estate that was to pass to Mr. Johnston and his heirs. Most significantly, while all three children were to share equally in the income from the Trust during Mr. Johnston's lifetime, upon Mr. Johnston's death the land and mineral rights were to be deeded to Ms. Goss and Ms. McPherson or their heirs. Mr. Johnston's children would receive no share of that property. Aplt's App. vol. I at 165-67 (The Ray Johnston Living Trust Agreement).

Ms. Goss and Father were named trustees, and Ms. McPherson and Jack Goss were to succeed them. Mr. Johnston would never become a trustee; instead, a corporate fiduciary was to succeed the named successor trustees. Id. at 152-54. In addition, Ms. Goss was to receive certain other property immediately upon Father's death.

## II. DISCUSSION

Our review of the district court's order is subject to the following standard:

> We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

8

law. When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court.

Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995) (citations omitted).

In a diversity case, while we apply the federal summary judgment standard, the determination of whether a party is entitled to judgment as a matter of law is made with reference to substantive state law. Perlmutter v. United States Gypsum Co., 54 F.3d 659, 662 (10th Cir. 1995). Our review of the district court's determinations of state law is de novo. Id. In this case it is uncontested that the substantive law of Oklahoma applies.

The Oklahoma Supreme Court has recently stated the legal standard for determining "whether undue influence taints the procurement or preparation of a will." In re Estate of Maheras, 897 P.2d 268, 272 (Okla. 1995). Initially, the analysis consists of two "prongs":

> First, the court must search for the presence of a relationship which would induce a reasonably prudent person to repose confidence and trust in another--i.e., a confidential relationship. Second, the court must decide that the stronger party in the relationship assisted in the preparation of the weaker person's testamentary instrument. Factors to be considered in applying this two-prong test include:
> 1. Whether the person charged with undue influence was not a natural object of the maker's bounty;
> 2. Whether the stronger person was a trusted or confidential advisor or agent of the will's maker;
> 3. Whether he/she was present and/or active in the procurement or preparation of the will;

9

4. Whether the will's maker was of advanced age
or impaired faculties;
5. Whether independent and disinterested advice
regarding the testamentary disposition was
given to its maker.

Id. at 272-73 (emphasis in original) (citations omitted). The burden of persuasion is on

the contestant to establish that these two conditions have been met. Id. at 272. If the

contestant meets this burden, then a rebuttable presumption of undue influence arises. Id.

at 273. The burden then shifts to the defendant to produce evidence that either (1) the

confidential relationship had been severed before the critical events in controversy or (2)

the settlor actually received independent and competent advice about the disposition of

his estate. Id. Although Maheras involved a will, we, like the district court, apply the

same analysis by analogy to the instant claim of undue influence in the obtaining of a

trust. See Estate of Gerard v. Gerard, 911 P.2d 266 (Okla. 1995) (applying the Maheras

analysis in an equitable challenge to the validity of a living trust).


## A. Presumption of undue influence?

With respect to the first prong of Maheras, there is no dispute that Father and Ms.

Goss were in a confidential relationship. Moreover, there is abundant evidence in the

record to support that conclusion. See Estate of Gerard, 911 P.2d at 271 (defining a

confidential relationship as "one that exists whenever trust and confidence are placed by

10

one person in the integrity and fidelity of another"); In re Estate of Beal, 769 P.2d 150,155 (Okla. 1989) (providing examples).

We next turn to the second prong and determine whether Mr. Johnston has presented evidence that raises a triable issue as to whether the stronger party in the relationship assisted in the preparation or procurement of the weaker person's testamentary instrument. In doing so, we consider each of the five factors enumerated above.

*Natural object of the maker's bounty?* It is undisputed that as his daughter, Ms. Goss was a natural object of Father's bounty. See Maheras, 897 P.2d at 273 n. 22 ("The natural object of a will-maker's bounty is one related to him/her by consanguinity.") (emphasis omitted). This fact tends to lessen our suspicion of her beneficial treatment under the trust and, as the district court correctly noted, distinguishes this case in that regard from Maheras, 897 P.2d at 273 (beneficiary was unrelated to decedent), and Anderson v. Davis, 256 P.2d 1099, 1105 (Okla. 1952) (same). However, while this informs our inquiry it is not dispositive. See In re Estate of Seegers, 733 P.2d 418, 423 (Okla. Ct. App. 1986) (holding that the testator's nephew had obtained his uncle's will through undue influence). Cf. In re Estate of Lacy, 431 P.2d 366, 371 (Okla. 1967) (holding that a testator lacked testamentary capacity, based in part on the conclusion that a will which

11

left the bulk of the estate to one of eight children was "an unnatural will"). We therefore proceed to consider the other Maheras factors.

*Confidential relationship?* As to the second factor, which is repetitive of the first prong, there is no dispute that Father trusted Ms. Goss and, as the district court observed, they had a confidential relationship. That Father gave Ms. Goss access to his checking account is direct evidence of his trust and confidence.

*Advanced age or impaired faculties?* Jumping ahead, for the moment, to the fourth factor, while it is undisputed that Father was ninety-three years old when the Trust was made, there is conflicting evidence as to his health and the degree to which he may have been subject to influence. Viewing the matter as we must in the light most favorable to Mr. Johnston, see Multistate Legal Studies, 63 F.3d at 1545, the record provides support, though weak support, for the claim that Father was in a vulnerable state. Mr. Johnston testified that Father would get confused about names and dates, that he sometimes referred to Dortha Goss by their mother's name, that his eyesight was poor, that he walked with two canes or a walker, and that Mr. Johnston was concerned about Father's ability to drive. While there is little independent evidence to support these claims, Ms. Goss's testimony confirms that Father had had a series of health problems in the years immediately preceding the execution of the Trust and that he sometimes relied on Ms.

Goss to help him with daily activities, and there is evidence that he did not write his own checks or drive far by himself.

No medical testimony was presented as to Father's health or fitness. We note that Mr. Johnston's burden in asserting undue influence is not the same as it would be were he asserting a claim of lack of testamentary capacity. See In re Estate of Carano, 868 P.2d 699, 703 (Okla. 1994) (explaining that "to have testamentary capacity a person must know in a general way the character and extent of his property and understand his relationship to the beneficiary of his gift as well as his relationship to those who 'ought to be in his mind,' and he must understand the nature and the effect of his act"). Of course, Ms. Goss does not bear the burden of producing evidence of Father's health. But in the absence of any independent rebuttal evidence, apart from her own testimony and that of others who have an interest in the validity of the trust, we conclude that Father's advanced age and health history creates a triable issue as to his susceptibility to undue influence. However, this issue is not material unless there is evidence of the third Maheras factor, that Ms. Goss was "present and/or active in the procurement or preparation of the will." See In re Estate of Beal, 769 P.2d at 156 ("Only when [a confidential] relationship is coupled with active participation in procurement or preparation of the will does the presumption [of undue influence] arise.").

*Present and/or active?* Ms. Goss was present during both of Father's meetings with Murphy and throughout the Trust closing. Mr. Johnston argues that this, coupled with her confidential relationship with Father, was sufficient to raise a presumption of undue influence under <u>Maheras</u>. We disagree because we conclude that the formulation in <u>Maheras</u> must be read in the context of prior cases which the <u>Maheras</u> court distilled. Those cases cannot be read to say that the mere presence of a confidential advisor during the preparation of the instrument raises a presumption of undue influence. <u>See</u> <u>Hubbell v. Houston</u>, 441 P.2d 1010, 1016 (Okla. 1967) (finding no undue influence where the evidence "showed a totally non-participating presence during the signing of the subject will"); <u>accord</u> <u>King v. Gibson</u>, 249 P.2d 84, 86-87 (Okla. 1952). However, as we discuss below, Mr. Johnston's ability to defeat summary judgment does not depend on our accepting his "mere presence" theory.

In contrast to Mr. Johnston's "mere presence" argument, the district court relied on <u>Hubbell</u>, in which the Oklahoma Supreme Court held that "the mere presence of the beneficiary at conferences or at the signing of the will [did not] constitute[] 'active participation' in the preparation of such instrument so that when coupled with a confidential relationship might give rise to a presumption of undue influence." <u>Id.</u> at 1018. We note, however, that more recent cases appear not to require "active" participation. <u>See</u> <u>Estate of Gerard</u>, 911 P.2d at 270 (holding that "the stronger party . . . must have assisted in the preparation" and restating the third <u>Maheras</u> factor as "present

14

and/or active in the procurement or preparation" (emphasis added)); Maheras, 897 P.2d at 272 (same). But see Maheras, 897 P.2d at 274 (using the phrase "actively participated" in summarizing the standard). The district court also noted that Mr. Johnston had presented no evidence "that would directly tend to show the influence." Aplt's App. vol. II, at 612. We agree, but where an allegation of undue influence is concerned, direct evidence of active procurement or participation may not be necessary if there is sufficient circumstantial evidence of procurement or participation. As the Oklahoma Supreme Court explained in In re Estate of Beal:

> Due in large part to the fact that the person claimed to have been the victim of undue influence is dead and cannot testify, we recognize that ordinarily the issue is capable of proof only circumstantially. The contestant is not confined to the facts he is able to present, but is entitled to the normal inferences which may be derived therefrom. . . .
> > To establish undue influence it is not necessary that there be direct testimony that threats were made or even persistent entreaty or persuasion was brought to bear upon the mind of the testatrix. It is sufficient that, if from all the surrounding circumstances connected with the making of the will it appears that any undue influence has been exercised, the court should not admit the will to probate.

769 P.2d at 154 (citations omitted) (quoting McCarty v. Weatherly, 204 P. 632, 638 (Okla. 1922)); accord In re Estate of Seegers, 733 P.2d 418, 420 (Okla. Ct. App. 1986) (citing In re Cook's Estate, 175 P. 507, 509 (Okla. 1918)).

In this case, there is considerable circumstantial evidence relating to Ms. Goss's participation in obtaining the trust. She knew Murphy while Father did not; she made the initial contact with Murphy; she drove Father to all of the meetings relating to the trust,

15

and she attended all of the meetings; there is evidence that she was the contact for both Murphy and Boring; and she paid Murphy. And while we do not weigh the evidence, we may note that all of the testimony for the defendants comes from those who have an interest in maintaining the validity of the trust. While there is no direct evidence that Ms. Goss was active in <u>preparing</u> the trust, there is much evidence that she "procured" it. "Procurement" is defined as "[t]he action of causing, compassing, accomplishing or bringing about, esp[ecially] through the instrumentality of an agent; management, arrangement; authorization, instigation; prompting, contrivance." 12 <u>Oxford English Dictionary</u> 559 (2d ed. 1989). To "procure" is "to bring about." <u>Webster's II New Riverside Univ. Dictionary</u> 938 (1988). Mr. Johnston has presented unrebutted evidence that Ms. Goss contacted the necessary advisors, made the appointments, transported Father to the meetings and wrote one of the checks. Hence, regardless of whether Ms. Goss was "active" during the meetings, there is a triable question as to whether her conduct constitutes "actively procuring" the trust.

Mr. Johnston also presented circumstantial evidence suggesting that witnesses for Ms. Goss could not adequately explain Father's apparent decision to supersede his 1983 will. While a testator ordinarily need not convince a court of his reasons for the chosen manner of disposition of his estate, when there is significant independent evidence that the instrument was obtained as a result of undue influence, the rationality of the disposition may be considered as evidence. <u>See</u> <u>In re Estate of Seegers</u>, 733 P.2d at 423

16

(relying in part on the lack of a rational explanation for the departure from an earlier will in finding a prima facie showing of undue influence). None of the witnesses who testified that Father wanted to prevent his son from selling the family farm could explain why Father had apparently come to that decision between 1983 and 1992, or how that desire was served by eliminating Mr. Johnston's inheritance of the mineral rights or by-passing him as a trustee. The <u>only</u> witness with <u>no</u> interest in the validity of the trust, the parties' uncle, testified that he did not believe that Father "would have knowingly treated one of his three children significantly different from the others in their inheritance." Aplt's App., vol. I, at 257 (Affidavit of Robert R. Johnston). Nor does the explanation that Father wanted to reward Ms. Goss for her kindness answer questions about why the Trust benefited both Ms. Goss <u>and</u> Ms. McPherson to the detriment of Mr. Johnston and his heirs.

We recognize the authorities that state that undue influence involves wrongful action. See <u>In re Estate of Webb</u>, 863 P.2d 1116, 1121 (Okla. 1993) ("'[U]ndue influence' means a wrongful influence . . . .") (citations omitted). While gifts made out of affection certainly are not wrongful, see <u>King</u>, 249 P.2d at 88, the evidence as a whole raises a question as to whether Father's testamentary disposition reflects nothing more than a desire to express affection or gratitude to Ms. Goss. We further recognize that the "'<u>opportunity</u> for undue influence, standing alone, is not sufficient to establish undue influence.'" <u>Matter of Estate of Beal</u>, 769 P.2d at 154 (quoting <u>McCarty</u>, 204 P. at 638)

17

(emphasis added). However, we cannot presume that a reasonable jury could not have concluded from the circumstantial evidence presented by Mr. Johnston that Ms. Goss actually exerted undue influence. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (summary judgment may be defeated "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

## B. The presumption rebutted?

We conclude that Mr. Johnston has raised a triable issue as to whether Ms. Goss participated in the procurement of the Trust so as to raise a presumption of undue influence. Once such a presumption arises, the burden shifts to the defendant to produce evidence that either (1) the confidential relationship had been severed before the critical events in controversy or (2) the settlor actually received independent and competent advice about the disposition of his estate. Maheras, 897 P.2d at 273. However, merely demonstrating that there is a genuine triable issue as to whether a presumption of undue influence has arisen is insufficient to defeat summary judgment. While the burden of production shifts at this stage to the defendant, the burden of persuasion remains with the plaintiff. See id. at 272 (holding that "the burden of persuasion in a will contest based on undue influence rests on the contestant"); id. at 273 n. 19 (highlighting the distinction between the burden of production and the burden of persuasion). Therefore, at the summary judgment stage, the defendants must produce evidence sufficient to rebut the

18

presumption of undue influence, and Mr. Johnston retains the ultimate burden of demonstrating that there is a genuine factual dispute about the evidence they produce. Cf. Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995) (discussing the application of the summary judgment standard to a multi-stage, burden-shifting, substantive legal standard).

There is no question that the relationship between Father and Ms. Goss was not severed before the execution of the trust. This leads us to consider the fifth Maheras factor. The district court concluded that, because it found no triable issue as to the presumption of undue influence, it did not need to consider whether Father had received independent and competent advice from either Murphy or Boring. We therefore consider this question de novo.

The Oklahoma Supreme Court has held that the term "independent advice" means:

> that the donor had the preliminary benefit of conferring fully and privately upon the subject of the [instrument] with a person who was not only competent to inform him as to its effect, but who was, furthermore, so disassociated from the interest of the [beneficiary] as to be in a position to advise with the donor impartially and confidentially as to the consequences to himself of the proposed benefaction.

Estate of Gerard, 911 P.2d at 271 (quoting Estate of Carano, 868 P.2d at 707). We conclude that the record does not reflect unambiguously that Father was given an opportunity to consult independently with either of the advisors. As previously noted, Ms. Goss was present at all of the meetings and made all of the contacts, and the record does not reflect that she ever left Father alone with either advisor. Both Murphy and

19

Boring testified that they did not recall ever speaking to Father on the phone before the execution of the trust. We conclude that a reasonable jury could find that Ms. Goss did not meet the burden of production required of a defendant to whom the presumption of undue influence has attached. See In re Estate of Seegers, 733 P.2d at 424 (no independent consultation where the lawyer who prepared the will was hired by the beneficiary and had a "considerable" relationship with the beneficiary and his family).

The district court emphasizes language in some of the Oklahoma cases requiring that the influence be of the sort that "destroys the free agency of the [settlor] at the time when the instrument is made and which, in effect, substitutes the will of another for that of the [settlor]." Myers v. Myers, 266 P. 452, 455 (Okla. 1927) (citations omitted). Similarly, the appellees argue that the influence "must destroy the grantor's free agency, . . . in effect, substituting the will of another for that of the grantor." See Aple's Br. at 19 (quoting In re Estate of Webb, 863 P.2d at 1121 (quoting Watkins v. Musselman, 239 P.2d 418, 423 (Okla. 1951))). While we have no reason to doubt that undue influence is still defined in those terms, we can only observe that we are bound by the two-prong, five-factor analytic framework that was established in Maheras and followed in the Oklahoma Supreme Court's most recent statements of the law in this area. See Estate of Gerard, 911 P.2d 266 (Okla. 1995) (following the Maheras framework); Estate of Carano, 868 P.2d 699 (Okla. 1994) (same). In the same vein, excessive reliance must not be placed on Hubbell, 441 P.2d 1010. To the extent that the law of Oklahoma has evolved in

20

the period between <u>Hubbell</u> and the more recent decisions in <u>Maheras</u> and <u>Estate of Gerard</u>, the analysis of these later cases of course controls our decisions.

### III.  CONCLUSION

While we recognize that this is a close case, and that most of the evidence presented by Mr. Johnston is circumstantial, we conclude that Mr. Johnston has presented sufficient evidence to warrant a trial.  We therefore VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.  The court should apply the two-prong <u>Maheras</u> test.  A trial will permit the finder of fact to observe the witnesses who testified that Ms. Goss did not participate meaningfully in the meetings with Murphy and Boring.  The probative value of their testimony, as well as all of the other evidence that there was no undue influence, should be weighed against both the direct evidence and the circumstantial evidence relating to whether Ms. Goss procured the trust.

Because the validity or invalidity of the Trust has not been conclusively determined, we do not reach the question of the application of the no-contest clause and remand that issue to the district court.  We also do not decide how any right that any party might have to a jury trial is affected by our determination of the issues in this appeal.

The mandate shall issue forthwith.

Entered for the Court,

21

Robert H. Henry
Circuit Judge